## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## (NORTHERN DIVISION)

**WEEMS & PLATH, LLC**
**214 Eastern Avenue**
**Annapolis, Md 21403**

      **Plaintiff,**

**v.**

**SIRIUS SIGNAL, L.L.C.**
**1042 North El Camino Real, Suite B-200**
**Encinitas, CA 92024,**

**ANTHONY COVELLI**
**6541 Vispera Place**
**Carlsbad, California 92009,**

**Case No. _____**

**ROBERT SIMONS, JR.,**
**3634 7th AVE, 8A**
**San Diego, CA 92103,**

**EMLINQ LLC,**
**2125C Madera Rd.**
**Simi Valley, CA 93065,**

**SCOTT MELE,**
**18 Amity Court**
**Langhorne, PA 19047,**

**TEKTITE INDUSTRIES, INC.**
**309 N. Clinton Ave.**
**Trenton, NJ 0863,**

**JOHN DOES 1-50, and**

**ABC CORPS 1-50**

      **Defendants.**

## **COMPLAINT**

1.　　　　Plaintiff Weems & Plath, LLC ("W&P"), by and through undersigned counsel, sues defendants Sirius Signal, L.L.C. ("Sirius"), Anthony Covelli ("Covelli"), Robert Simons, Jr. ("Simons"), Emlinq, LLC ("Emlinq"), Scott Mele ("Mele"), Tektite Industries Inc. ("Tektite"), John Does 1-50 ("Does"), and ABC Corps 1-50 ("ABC Corps") (collectively the "Defendants") (Sirius, Covelli, Simons, Mele, and Tektite also hereinafter referred to as "Tektite/Sirius Defendants") (Sirius, Covelli, and Simons also hereinafter referred to as "Sirius Defendants") jointly and severally and states for cause the following:

## Introduction

2.　　　　W&P has been a leader in nautical instruments since 1928.  W&P is the assignee and successor-in-interest of Weems & Plath, Inc. ("Weems"), the named party to the Agreement with Sirius and related Amendments, which were executed on behalf of Weems & Plath, Inc., by Peter Trogdon ("Trogdon"), the former president of Weems & Plath, Inc.

3.　　　　One of the founders of Weems, Captain Phillip Van Horn Weems, taught at the U.S. Naval Academy in Annapolis, Maryland, and then established his own school to teach the Weems System of Navigation. Charles Lindbergh studied with Captain Weems before attempting his trans-Atlantic flight. Rear Admiral Richard Evelyn Byrd Jr., a classmate of Captain Weems at the Naval Academy, came to Captain Weems for instruction, as did many others, before setting out for the North Pole.

4.　　　　The other founder of Weems, Carl Plath, developed the first gyrocompass to be installed in a commercial vessel.  Capt. Weems and Mr. Plath teamed up in 1928 to form Weems in Annapolis, where it is still located today.

5.　　　　Over the years, Weems and W&P has developed strong goodwill in the nautical community.

6.      This Complaint is brought under the Sherman Antitrust Act and the Clayton Antitrust Act, the laws of the State of Maryland, and federal patent and false advertising laws. W&P seeks compensatory damages, restitution, disgorgement, treble damages, injunctive relief, and other relief, including but not limited to an award of attorneys' fees and expenses, as well as pre-judgment and post-judgment interest on the damages awarded, against Defendants, jointly and severally, for conspiring in the unreasonable restraint of trade or commerce to exclude W&P from competing in the development, production, and sale of Electronic Visual Distress Signal Devices ("eVDSDs") by unlawfully terminating its license and otherwise suppressing and eliminating competition in the sale and marketing of eVDSDs in order to artificially fix, inflate, and maintain the price of eVDSDs to unlawfully maximize economic gain by agreeing to, upon information and belief: 1) fraudulently procure, assert, license, and attempt to license invalid patents to Weems/W&P and Standard Fusee Corporation, Inc. doing business as Orion Safety Products ("Orion") for the purpose of disproportionate economic gain and increased distribution of the C-1001; 2) deceive the public, Weems, and W&P regarding the validity of the Sirius IP; 3) control the information required to manufacturer the eVDSDs; 3) control the supply of the eVDSDs and components thereof including to the exclusive worldwide licensee of the eVDSDs via refusing to manufacture, or artificially inflating the costs of manufacture of, the eVDSDs; 4) manipulate USCG federal regulations through participation in USCG committees; 5) utilize information gleaned from the USCG committee meetings to procure patents and withholding the issuance of such patents from the USCG and the other members of the USCG committee; 6) unlawfully tie the continued licensing of the C-1001 to a new license for the C-1002 including a substantial upfront payment of $275,000 (in addition to the $200,000 previously paid for the license of the C-1001) despite the C-1002 being including in the initial Agreement, 7) when (6)

was unsuccessful, eliminate competition by attempting to license a sole competitor of the eVDSDs while simultaneously terminating, without cause, the license to the current exclusive distributor in violation of the distributor's Right of First Offer; 8) commit multiple breaches of the Agreement including, but not limited to, the manufacture and sale of Licensed Products during a period in which Sirius does not dispute that the exclusive license to W&P was in full force and effect; 9) implement an illegal Minimum Advertised Price ("MAP") policy in order to implement vertical price fixing and price maintenance; 10) harass at least one customer of W&P by reporting it to a governmental agency both directly and through use of the alias Peter Saxsby in order to suppress competition in the eVDSD market; and 11) bind Weems/W&P to provisions that served anti-competitive purposes by seeking to restrain Weems/W&P from activities that were not prohibited by the Licensed Patents (the "Conspiracy").

7.      Upon information and belief, at least the Tektite/Sirius Defendants conspired to fix, stabilize, inflate, and maintain the price of eVDSDs sold to consumers and companies in the United States from at least as early as 2013, at which time Covelli joined Special Committee 132, through at least December 31, 2019 (the "Conspiracy Period"), and this conspiracy still continues and is ongoing.

8.      W&P seeks a full refund of the Agreement Payments paid for its eVDSD license for the same actions by the Defendants and their co-conspirators. Defendants' and their co-conspirators' actions caused consumers across the United States to overpay for eVDSDs as a whole, as eVDSDs are the only electronic option capable of meeting the USCG's visual stress signal requirements to which every boater must adhere. Plaintiff has needlessly paid to license the purported rights to sell eVDSDs, and now seeks to recover damages they suffered from the

initiation of the conspiracy until the date of filing of this action (the "Injury Period"). Upon

information and belief, this anticompetitive behavior has not ceased but rather is ongoing.

9.        Covelli, Simons, and Mele as Defendants are individually liable for the actions

described herein because the conspiracy predated the formation of the business entity Sirius that

subsequently controlled the fraudulent patents and purported licensing rights in question.

10.       Covelli, Simons, and Mele as Defendants are individually liable for the actions

described herein because the conspiracy was committed on their individual behalves including,

but not limited to, Covelli and Simons acting in their personal capacity as the inventors of the

Sirius IP.

11.       Defendants are manufacturers and distributors of eVDSDs, or components

thereof, used by boaters to meet the USCG's visual stress signal requirements to which every

boater on a boat in open water must adhere. Specifically, Defendants manufacture and/or

distribute the C-1001, C-1002, and C-1003 (the "C Series Lights") eVDSDs purportedly

designed and patented by Sirius or components thereof.  The C-1003 is sold by Sirius as the

newer, upgraded model of, and replacement for, the C-1001.

12.       During the Conspiracy Period, upon information and belief, Defendants and their

co-conspirators conspired, combined, and contracted to fix, raise, maintain, and stabilize the

prices at which eVDSDs would be sold.

13.       Upon information and belief, in order to facilitate the conspiracy, Defendants and

their co-conspirators, throughout the Conspiracy Period, engaged in regular, often secret

communications, verbally and through electronic mail, the facts of which are set out elsewhere in

this Complaint, to further the Conspiracy, including, but not limited to communications

regarding: 1) the procurement of invalid and unenforceable patents referred to herein as the

Sirius IP through the commission of fraud on the United States Patent and Trademark Office ("USPTO") via, at a minimum, (a) the submission of false affidavits to the USPTO and (b) the withholding of at least the Material Information from the USPTO during prosecution of the Sirius IP; 2) licensing the invalid and unenforceable Sirius IP to Weems/W&P through the issuance of false statements including, but not limited to, false statements regarding inventorship of the Sirius IP made to Weems' during its due diligence performed prior to licensing the Sirius IP; 3) falsely marking the C-1001 with U.S. Patent Nos. D720,247 and 9,171,436 for at least three years after Defendants' received an opinion of counsel that the '247 Patent and the '436 Patent do not cover the C-1001 product; 4) otherwise falsely marking the C-1001, C-1002, and C-1003 products as "patent pending" or with other patents of the Sirius IP knowing that the Sirius IP is invalid and unenforceable; 5) controlling the supply of components and services required to manufacture the C-1001 to suppress the supply of eVDSDs as a whole by conspiring to implement a horizontal boycott by rejecting purchase orders placed by W&P with its suppliers, or delaying and artificially inflating the price of purchase orders placed by W&P with its suppliers, during a time in which it is not disputed that W&P was the exclusive worldwide distributor of the C-1001 pursuant to the Agreement, to prevent W&P from manufacturing and selling the C-1001 including sales during the Sell-Off Period; 6) controlling information required to manufacture the C-1001 to suppress the supply of eVDSDs as a whole including refusing to provide the information necessary to manufacture the C-1001 (e.g., Gerber Files) to W&P during a time in which it is not disputed that W&P was the exclusive worldwide distributor of the C-1001 pursuant to the Agreement, to prevent W&P from making the circuit board with an alternate supplier; 7) distribution of an illegal MAP policy intended to implement vertical price fixing and price maintenance of all single color eVDSDs available for sale in the relevant market

to $89.95 and of all two color eVDSDs in the relevant market to $299.95; 8) abusing Covelli's

position on the 132 Committee in order to obtain information used for the fraudulent

procurement of Sirius IP; 9)  abusing Covelli's position on the 132 Committee in order to

manipulate the USCG Distress Signal Regulations such that they would eliminate competition in

the eVDSD relevant market by removing the single color eVDSD from the pool of USCG

acceptable eVDSDs, thereby leaving the Defendants' C-1002 as the only USCG-approved

eVDSD available in the relevant market and artificially raising the price of eVDSDs from $89.95

to $299.95; 10) lobbying for a change in the USCG Regulations to eliminate all one color

eVDSDs for the purpose of eliminating all competition in the relevant market, securing a

monopoly, and artificially inflating the price of an eVDSD to $299.95; 11) the termination of

Weems/W&P's rights as the exclusive distributor for the purpose of maintaining a monopoly and

the high margins associated therewith; 12) the illegal tying of a license agreement for C-1002s

(the tied product), including payment of an upfront license fee of $275,000, to execution of an

amendment that would allow W&P to continue to distribute the C-1001/C-1003 (the tying

product) despite the fact that (a) W&P had already paid an upfront license fee of $200,000, (b)

W&P had invested substantial money in advertising and otherwise related to the C-1001, and (c)

the Agreement already granted a license to the C-1002; 13) attempting to wrongfully terminate

W&P as the exclusive worldwide distributor of the eVDSDs in breach of the Agreement and to

prevent W&P from development, production, and sale of eVDSDs in order to force W&P to take

a license to the C-1002 including payment of the $275,000 upfront licensing fee; 14) attempting

to wrongfully terminate W&P as the exclusive worldwide distributor of the eVDSDs in breach of

the Agreement and to prevent W&P from development, production, and sale of eVDSDs in order

to divert the C-1001 sales of W&P to the Tektite/Sirius Defendants as C-1003 sales; 15) falsely

claiming that the C-1001 was no longer being distributed by W&P; 16) when W&P would not agree to license the C-1002 without receiving additional information from the Sirius Defendants, attempting to wrongfully terminate W&P as the exclusive worldwide distributor of the eVDSDs in breach of the Agreement in favor of licensing the fraudulent Sirius IP to the owner of the sole competitive eVDSD product in order to obtain a monopoly; 17) harassing at least one customer of W&P by reporting it to a governmental agency both directly and through use of the alias Peter Saxsby in order to suppress competition in the eVDSD market; and 18) binding Weems/W&P to provisions that served anti-competitive purposes by seeking to restrain Weems/W&P from activities that were not prohibited by the Licensed Patents(the "Conspiracy Acts").

14.        Upon information and belief, as a result of Defendants' and their co-conspirators' unlawful conduct, Plaintiff and consumers paid more for the right to distribute and own, respectively, eVDSDs than they would have if a competitive market had determined eVDSD prices.

15.        Plaintiff sustained damages as a result of Defendants' and their co-conspirators' anticompetitive conduct as alleged herein.  Plaintiff also sustained damages as a result of breach of contract, unfair competition, tortious interference with business relations/expectancy, civil conspiracy, tortious interference with contractual relations, fraud, promissory estoppel, direct and indirect unjust enrichment, false marking, and false advertising as further set forth herein.

### Parties

**Plaintiff**

16.        Plaintiff W&P is a Maryland limited liability company with its principal place of business at 214 Eastern Avenue, Annapolis, Maryland 21403.  The sole member of W&P, Michael Flanagan, is a citizen of New Jersey.

**Defendants**

17.      On information and belief, Defendant Sirius is a limited liability company

organized under the laws of the State of California with its principal place of business located in

the State of California, and all members of Sirius Signal, L.L.C. are citizens of California.

Although Sirius Signal, L.L.C. has represented itself at times as a corporation (e.g., "Sirius

Signal, Inc.") in related documents, no such corporation is known to exist, and Sirius's

representation as such appears to be false, both as a matter of fact and as a matter of law.

18.      Upon information and belief, Defendant Covelli resides in the State of California

at 6541 Vispera Place, Carlsbad, California 92009.  Covelli is an owner of, a member of, and the

CEO of Plaintiff Sirius.  Sirius has only three other members, one of whom is Simons, who is a

purported co-inventor with Covelli in the Sirius IP (as defined below) that was purportedly

licensed originally to W&P's predecessor-in-interest, ("Weems") pursuant to the agreement

Sirius entered with Weems on December 31, 2015, as amended three times, i.e., the first

amendment executed February 8, 2016 (the "First Amendment"), the [Second] Amendment

made March 10, 2016 (the "Second Amendment"), and the Third Amendment made August 18,

2017 (the "Third Amendment") (collectively, the "Agreement"), which license was transferred

thereafter to W&P on or about September 20, 2018.

19.      Upon information and belief, Simons resides in the State of California at 3634 7th

Avenue, 8A, San Diego, California 92103.  Simons is an owner and member of  Sirius and is a

purported co-inventor with Covelli of the Sirius IP that was purportedly licensed to

Weems/W&P pursuant to the Agreement.

20.      As members and owners of Sirius, Covelli and Simons are not employees of

Sirius under relevant federal and state laws pertaining to employment and taxation.  Rather,

Covelli's and Simons' authority to bind, act on behalf of, and in concert with, Sirius arises out of Covelli's and Simons' ownership and member status relative to Sirius.  Likewise, as individuals, Covelli and Simons are distinct from the legal entity Sirius, and Covelli and Simons have acted independently on their personal behalves and have also used Sirius to act as Covelli's and Simons' agent and alter ego in conduct described herein.

21.     Upon information and belief, Emlinq is a California limited liability company with its principal place of business at 2125C Madera Rd., Simi Valley, California 93065. Emlinq is a supplier of circuit boards for at least the C-1001 and, upon information and belief, also the C-1002 and C-1003.

22.     Upon information and belief, Mele resides at 18 Amity Court, Langhorne, PA 19047 and is owner and President of Tektite.

23.     Upon information and belief, Tektite is a New Jersey corporation with its principal place of business at 309 North Clinton Avenue, Trenton, New Jersey 08638.  Tektite is a manufacturer of lights and strobes including, but not limited to, the C-1001 and, upon information and belief, the C-1002 and C-1003.  Tektite is the owner of expired U.S. Patent No. 6,168,288, which discloses a product materially relevant to the C Series Lights, and, upon information and belief, is the developer and designer of the C Series Lights.

**C.  Unidentified Co-Conspirators**

24.     Other individuals and entities, not named as Defendants in this Complaint, may have participated as co-conspirators with Defendants in the violations alleged herein, and aided and abetted Defendants and performed acts and made statements, all in furtherance of the conspiracy.

25.     The true names and capacities of some of these co-conspirators, whether

individual, corporate, associate, or representative, are unknown to Plaintiff at this time. Plaintiff

may amend this Complaint, as necessary, to allege the true names and capacities of additional

co-conspirators as their identities become known through discovery or otherwise.

26.     At all relevant times, other individuals and entities referred to herein as

"unidentified co-conspirators," the identities of which are presently unknown, conspired with

Defendants in the unlawful conspiracy described herein.

27.     The acts alleged herein that were performed by each of the unidentified

coconspirators were fully authorized by each of these unidentified co-conspirators, or were

ordered, or committed by duly authorized officers, managers, agents, employees, or

representatives of each unidentified co-conspirator, while actively engaged in the management,

direction, or control of its affairs.

## Jurisdiction

28.     This Court has federal question jurisdiction over the subject matter of this action

pursuant to 15 U.S.C. §§ 1 and 2 (Sherman Antitrust Act jurisdiction), 15 U.S.C. §§ 15 & 26

(Clayton Antitrust Act jurisdiction), 28 U.S.C. § 1331 (general federal question jurisdiction), 28

U.S.C. § 1337 (antitrust jurisdiction), 35 U.S.C. § 292(a) (false marking), and 15 U.S.C. § 1125

(the Lanham Act/false advertising). The Court has jurisdiction over Plaintiff's state law claims

pursuant to 28 U.S.C. § 1367 (pendent jurisdiction).

29.     This Court also has subject matter jurisdiction over W&P's claims against

Covelli, Mele, and Simons pursuant to 28 U.S.C. § 1332 because the parties are diverse and the

amount in controversy exceeds $75,000.  W&P is a citizen of Maryland and New Jersey as it is a

Maryland limited liability company, and W&P's sole member is a citizen of New Jersey.  Upon

information and belief, Covelli is a citizen of California, Mele is a citizen of Pennsylvania, and Simons is a citizen of California.

30.     This Court has personal jurisdiction over the Defendants pursuant to federal principles of due process and to §§ 6-103(b)(1), 6-103(b)(2), 6-103(b)(3), and 6-103(b)(4) of the Courts and Judicial Proceedings Article of the Maryland Annotated Code (Maryland's "Long Arm Statute" at Md. Code Ann., Cts. & Jud. Proc. § 6-103 (2018)) and Maryland's conspiracy theory of jurisdiction.

31.     Covelli and Simons have purposefully availed themselves of: (1) this Court by filing on behalf of, and in concert with, Sirius an action in this Court related to the Agreement, governed by Maryland law, with a Maryland company covering patents personally owned by Covelli and Simons; (2) this Court by consenting for Sirius to be governed by Maryland law in interpretation and enforcement of the Agreement, and at least Covelli consenting to personally bind himself in the Third Amendment; (3) this District by transacting business in this District through Covelli personally soliciting and negotiating with the Maryland company Weems, while physically in the State of Maryland, the Agreement to have the Maryland company Weems be the exclusive worldwide licensee of the patents licensed pursuant to the Agreement (the "Licensed Patents"), thereby causing all product made pursuant to the Agreement to be distributed from and through the State of Maryland (i.e., through the Maryland offices of Weems/W&P), and wherein at least a portion of the Licensed Patents are or were, until recently, personally owned by Covelli and Simons; (4) at least Covelli personally attending at least annual meetings that occurred in the State of Maryland at the offices of Weems/W&P to review the status of the business transacted in accordance with the Agreement; (5) at least Covelli personally negotiating a fourth amendment to the Agreement with the Maryland company W&P;

and (6) both Covelli and Simons, as members of Sirius deriving substantial revenue from the goods and services consumed in the State of Maryland, namely the C-1001, and the sales and distribution services of the C-1001 goods, which services were and are transacted at and through the offices of Weems/W&P in Annapolis, Maryland, the amount of such sales of the C-1001 transacted through these Maryland companies pursuant to the Agreement exceeding 4.5 million dollars; and (7) Covelli and Simons have triggered specific personal jurisdiction by causing to the Maryland companies Weems/W&P the tortious injuries that comprise the basis of W&P's third-party claims through the actions described herein.

32.      Additionally, Covelli and Simons purposefully availed themselves of this Court and this District by transacting business on their personal behalves in the State of Maryland.  At least as early as July 28, 2015, Covelli was in at least email communication with Weems regarding a potential licensing of the '247 Patent and the not yet issued '436 Patent of which seventy-five percent (75%) was *personally* owned by Covelli and twenty-five percent (25%) was *personally* owned by Simons despite the fact that Sirius had been in existence since March 5, 2015.  At this time and until the Assignment Date, Sirius did not own the '247 Patent or the '436 Patent, and at a minimum, all activities that occurred prior to December 23, 2015 (the "Assignment Date") were transacted by Covelli and Simons as individuals and on their personal behalves including, without limitation, Covelli's attendance at a business meeting with Trogdon, at the Annapolis Yacht Club located in Annapolis, Maryland on August 6, 2015 for the sole purpose of licensing his and Simons' patents.

33.      Covelli and Simons availed themselves of the privilege of conducting business in Maryland on their personal behalves, and Covelli visited Maryland for such purpose regularly including, but not limited to, on: (1) <u>October 8, 2015 through October 12, 2015</u>: Covelli

personally appeared at the Annapolis Boat Show, held in Annapolis, Maryland, at which he, at a minimum, sold the C-1001, held a VIP event, and was interviewed for a YouTube video; (2) January 6, 2016: Covelli attended a meeting at the offices of Weems in Annapolis, Maryland to kick-off Weems' sale of the C-1001 pursuant to the Agreement; (3) October 6, 2016:  Covelli personally attended the United States Sailboat Show held at the Annapolis Yacht Club located in Annapolis, MD, at which he presented and demonstrated an X-1 smoke device, which is a product that was not licensed to Weems or W&P and, upon information and belief, was never sold by Sirius; (4) January 20, 2017:  Covelli attended a meeting in Maryland at the offices of the Weems to review 2016 sales of the C-1001 and to plan for 2017 sales of the C-1001; (5) October 6, 2017:  Covelli personally attended the United States Sailboat Show held at the Annapolis Yacht Club located in Annapolis, MD, at which he presented and demonstrated the AF-1, which is a product that was not licensed to Weems or W&P and, upon information and belief, was never sold by Sirius; and (6) November 8, 2018: Covelli attended a meeting regarding the Agreement and sales of the C-1001, which was held at the offices of W&P in Maryland, and afterward attended a business lunch at the Annapolis Yacht Club with Mr. Michael Flanagan, the current owner of W&P ("Flanagan").

34.     Covelli also personally bound himself to the Agreement upon his signing of the Third Amendment, which states in Section 9 Authority to Execute, "The parties to the Third Amendment and the Agreement as modified warrant, covenant and agree that the persons executing this Agreement are authorized and empowered to enter into and execute this Agreement as modified for and on behalf of the person or entity they represent, and that by their execution of the Agreement, each respective person or entity they represent, and all persons, partnerships, corporations, joint ventures and any person or entities affiliated with them, shall be

bound by the terms of this Agreement."  Covelli was authorized and empowered to personally

bind himself and make the Agreement binding on him, and he did so by signing the Agreement.

35.      Although it is unnecessary to pierce the corporate veil to find that this Court has

personal jurisdiction over Covelli and Simons because Covelli and Simons acted on their

personal behalves, Sirius is merely the alter ego of Covelli and Simons, and Sirius has no

independent reason for its existence, other than being under the complete domination and control

of Covelli and Simons and simply for the purpose of doing their act and bidding.

36.      Sirius was formed on March 5, 2015 and Sirius' Articles of Organization indicate

that the LLC "will be managed by one manager."  This manager was and remains Covelli.  In the

Statement of Information filed on April 27, 2017, Covelli is listed as the sole manager, the agent,

and the Chief Executive Officer of Sirius. And the Statement of Change filed on July 23, 2019

indicates that "there has been no change in any of the information contained in the previous

complete Statement of Information filed with the California Secretary of State."

37.      Sirius is a façade and a vehicle for Covelli's and Simons' eVDSD business and

the Conspiracy. Sirius has no identity of its own.

38.      Upon information and belief, Sirius does not itself manufacture any product, and

other than reselling Tektite produces on the Sirius Web Site, it does not sell any product other

than the C-Series Lights.  Upon information and belief, prior to termination of the Agreement, it

did not even sell the C-1001, but rather merely existed to collect royalties from Weems/W&P.

39.      Upon information and belief, at least Covelli and Simons conceived of the

Conspiracy and personally managed every aspect of the Conspiracy as detailed above.  There is

sufficient identity of interest between Covelli, Simons, and Sirius for the acts of one to be

attributable to the other.

40.        Sirius's main source of income is royalties received due to the exclusive, worldwide distribution of the C-1001 pursuant to the Agreement, sales which have exceeded 4.5 million and all of which are or were transacted through Weems/W&P's Maryland offices, and the C-1001 goods are also consumed in the State of Maryland. Thus, Sirius derives substantial revenue in the form of royalties from goods used and sold in and through the State of Maryland and by a Maryland entity.

41.        Upon information and belief, Sirius is grossly undercapitalized, and it consistently fails to observe corporate formalities.  Although Sirius was formed on March 5, 2015, Covelli and Simons failed to assign the '247 Patent and the '436 Patent to Sirius until December 23, 2015.  Covelli and Simons failed to assign the remainder of the Sirius IP to Sirius until late 2019/early 2020.

42.        Emlinq, Tektite, and Mele all transacted business with Weems and W&P by regularly selling circuit boards (Emlinq) and assembled C-1001s (Tektite and Mele) to W&P and its predecessor Weems for over three (3) years.  As such, Emlinq, Tektite, and Mele are subject to personal jurisdiction under at least § 6-103(b)(1) because they transacted business regularly in Maryland.

43.        If it is determined that Mele, or any other of the Defendants, did not transact business in Maryland as an individual, they are all subject to personal jurisdiction under the conspiracy theory of jurisdiction as explained below.  Specifically, with regards to Mele, he participated in the Conspiracy, as further described below in his capacity as an individual.  It is indisputable that Mele was NOT acting as an agent of Tektite when he, upon information and belief, personally designed the C-1001 and  committed other acts in furtherance of the

Conspiracy while operating in his personal capacity as discussed in greater detail throughout this Complaint.

44.       The conspiracy theory of jurisdiction in Maryland requires the following elements:  (1) two or more individuals conspire to do something; (2) that they could reasonably expect to lead to consequences in a particular forum; (3) one co-conspirator commits overt acts in furtherance of the conspiracy; and (4) those acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state, then those overt acts are attributable to the other co-conspirators, who thus become subject to personal jurisdiction in the forum, even if they have no direct contacts with the forum. See *Mackey v. Compass Mktg.,* 391 Md. 117, 892 A.2d 479, 486 (2006).

45.       The Defendants are all co-conspirators with each other.  The Defendants have conspired either as entities or individually, and/or through entities that they control, to further the Conspiracy through the performance of the Conspiracy Acts as set forth herein and through the facts set forth elsewhere in this Complaint.

46.       The Defendants all held a working relationship with Weems and W&P for more than three (3) years, and they were all aware that Weems and W&P were Maryland companies, as they regularly invoiced both Weems and W&P for the goods and services, or they held ownership in companies who performed such regular invoicing.  And all of the Defendants were aware that eVDSDs are sold and used within and throughout the state of Maryland.

47.       As such, the Defendants all had a reasonable expectation that participating in the Conspiracy by suppressing competition and fixing, inflating and maintaining prices of eVDSDs including those sold and used in Maryland, and conspiring to prevent the Maryland company

W&P from manufacturing and selling the C-1001, would lead to consequences in a Maryland forum.

48.     All of the Defendants committed overt acts in furtherance of the Conspiracy as set forth in greater detail throughout this Complaint including, but not limited to, the Conspiracy Acts.

49.     Although all of the Defendants have direct contacts with the forum, in the case that it is argued that they do not, they would still be subject to personal jurisdiction under the conspiracy theory of jurisdiction since, under this theory, all of the acts stated herein are of the type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of Maryland and as such those overt acts are attributable to the other co-conspirators, who thus become subject to personal jurisdiction in Maryland, even if they have no direct contacts with the forum.

## **<u>Venue</u>**

50.     Venue is proper in this district pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c), and (d), because all of the Defendants transacted business in, were found in, or had agents in this District. This Court has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business in this District; (b) participated in the manufacturing and/or distribution of the C-1001 in this District; (c) had substantial aggregate contacts with this District; and/or (d) engaged in the unlawful Conspiracy with regard to the sale of the C Series Lights as described herein, and that Conspiracy was directed at, and had the effect of causing injury to, persons and entities residing in, located in, and doing business in this District.

51.     Venue is also proper in this district pursuant to 28 U.S.C. § 1367 because

Defendant Sirius brought its Declaratory Judgment claim before this Court, and this action arises

from the same case or controversy as Sirius' Declaratory Judgment claim.

## Facts Relevant to All Causes of Action

52.     W&P repeats and re-alleges each of the foregoing allegations and following

allegations as though fully set forth herein.

### a.  eVDSD Background

53.     eVDSD stands for "electronic visual distress signal devices."  The USCG has

promulgated regulations that require boaters in a boat on open water to carry current, non-

expired USCG-approved day and night signals, namely, 46 CFR 161.013 (the "Night Vision

Distress Signal Regulations") and 33 CFR 175.130 (the "Day Vision Distress Signal

Regulations)(collectively the "USCG Distress Signal Regulations").

54.     Acceptable signals include the following combinations: 1) three hand-held red

flares (day and night) under 42 months of age; 2) one electric distress light (night only) and one

flag (day); and 3) (i) one hand-held red flare and two parachute flares (day and night), or (ii) one

hand-held orange smoke signal, two floating orange smoke signals (day) and one electric distress

light (night only), wherein the flares must be under 42 months of age.

55.     As such, eVDSDs should provide a low cost alternative for boaters to comply

with the mandatory USCG Distress Signal Regulations because, unlike pyrotechnic flares,

eVDSDs do not require continual replenishment every forty-two months.  Further, eVDSDs are

sold by at least Sirius as an "environmentally-conscious legal alternative to toxic marine flares."

56.     At least the Sirius Defendants manufactured and sold a packaged product

including a C-1001 eVDSD along with a flag (the "C-1001 Kit") and now manufacture and sell a

packaged product including a C-1003 eVDSD along with a flag (the "C-1003 Kit") that allows boaters to be fully compliant with the USCG Distress Signal Regulations as the C-1001/C-1003 satisfies the Night Vision Distress Signal Regulations and the flag satisfies the Day Vision Distress Signal Regulations.

57.     To date, the Sirius Defendants have procured a multitude of fraudulently obtained eVDSD patents and have additional patent applications pending including: U.S. Patent D720247 based on U.S. Patent Application 29/493,224 filed on June 6, 2014 (the "'247 Patent"); U.S. Patent 9171436 based on U.S. Patent Application 14561197 filed on December 4, 2014 (the "'436 Patent"); U.S. Patent D784175 based on U.S. Patent Application 29557241 filed on March 07, 2016 (the "'175 Patent"); U.S. Patent 9682754 based on U.S. Patent Application 15095727 filed on April 11, 2016 (the "'754 Patent");  U.S. Patent D811920 based on U.S. Patent Application 29595834 filed on March 02, 2017 (the "'920 Patent"); U.S. Patent Application 15624033 filed on June 15, 2017 (the "'033 Application");  U.S. Patent D844477 based on U.S. Patent Application 29638591 filed on February 28, 2018 (the "'477 Patent"); U.S. Patent 10227114 based on U.S. Patent Application 16004987 filed on June 11, 2018 (the "'114 Patent"); U.S. Patent Application 16692449 filed on November 22, 2019 (the "'449 Application"); and U.S. Patent Application 16245947 filed on January 11, 2019 (the "'947 Application") (collectively the "Sirius IP").

58.     The Sirius Defendants have used, and continue to attempt to use, the fraudulently procured Sirius IP as a tool in furthering the Conspiracy and in committing the Conspiracy Acts as detailed elsewhere herein.

**b.  History**

59.     On August 5, 1999, a patent application was filed for a "Flashlight with Light Emitting Diodes" naming Christian P. St. Claire as the inventor,  which patent application issued as U.S. Patent No. 6,168,288 (the "'288 Patent") on January 2, 2001.

60.     On July 23, 1999, the application for the '288 Patent was assigned from the inventor to Tektite Industries West, LLC ("TIW").

61.     Upon information and belief, Mele, Elizabeth Mele, and Veronica Mele were all involved in TIW as they are all listed as managers or members on one or more of the TIW Limited Liability Company Statement of Information filed with the State of California on March 22, 2002 and January 3, 2003.

62.     On January 16, 2001, the '288 Patent was assigned from TIW to Tektite.

63.     The '288 Patent expired twice for nonpayment of maintenance fees.  The first time occurred on February 2, 2005, and Tektite petitioned to accept the filing of a late maintenance fee payment, which was granted on September 21, 2005.

64.     The '288 Patent expired again on January 28, 2013 due to failure to pay the maintenance fee.  Upon information and belief, despite the expiration of the patent, Tektite and Mele continued to falsely mark the product associated with the '288 Patent until 2020.

65.     Upon information and belief, despite the expiration of the patent and the fact that Sirius did not own the patent, the Tektite/Sirius Defendants marked the C-1001 product with the number of the '288 Patent and, at a time during which the '288 Patent had expired, falsely represented to Weems that the '288 Patent was valid and covered the C-1001 product.

66.     Upon information and belief, at least Covelli, Simons, and Mele began conspiring in or around 2013 to enter into the eVDSD business and to commit the Conspiracy, including: 1) agreeing to apply for eVDSD patents in the name of Covelli and Simons, thereby falsely naming

inventors and/or intentionally omitting at least one inventor to reduce the chance that the USPTO

would correlate the technology of the new eVDSD applications with the '288 Patent; and 2)

agreeing that Covelli join USCG Special Committee 132 (the "132 Committee"), which is a

committee of the Radio Technical Commission for Maritime Services ("RTCM"), in order to

manipulate the USCG to obtain a competitive advantage.

67.     The 132 Committee was chartered in 2013 to create regulations and issue

standards relating to "Electronic Visual Distress Signals".

68.     In furtherance of the Conspiracy, Covelli became a member of the 132

Committee, and, upon information and belief, remains a member of the 132 committee, and was

personally involved in the 132 Committee's creation of RTCM Standard 13200.0, that was

published on June 21, 2018 and adopted on December 21, 2018 (the "2018 RTCM Standard").

69.     Upon information and belief, Covelli has obtained information from these

committee meetings and improperly used this information to fraudulently attempt to patent

eVDSD products that he did not invent, by falsely claiming inventorship of the eVDSD devices

and failing to submit material prior art to the USPTO during prosecution of the eVDSD Patents

including, without limitation: 1) the USCG Distress Signal Regulations that dictate the

specifications of any USCG-approved eVDSD; 2) the 2018 RTCM Standard; 3) the '288 Patent;

and 4) material relating to Covelli's work on the USCG Committee (collectively referred to

herein as the "Material Information").

70.     Covelli and Simons failed to disclose to the USPTO anyone associated with

Tektite as an inventor of the Sirius IP despite the fact that: 1) Mele claims that Tektite is

responsible for the design of the C-1001 product; and 2) the '288 Patent discloses an on/off

switching mechanism identical to that of the C-1001, in which the activation of the light is done

via rotation of the lens through which the light shines (the "On/Off Lens Switch") as is claimed in Sirius' '754 Patent.

71.     At least as early as July 15, 2015, the C-1001 was being falsely advertised as a patented product and was touted as the only eVDSD approved by the USCG.

72.     At least as early as July 15, 2015, the Web page located at www.siriussignal.com (the "Sirius Web Site") depicted a picture of the C-1001 and the following language to the left side thereof "Complies with all U.S. Coast Guard requirements for 'Night Visual Distress Signals' 46 CFR 161.013.  When combined with the included daytime distress signal flag, meets all USCG Federal Requirements for carriage of DAY and NIGHT VDS.  Designed, engineered, **patented**, and produced in the USA" (emphasis added).  At this time, no Sirius U.S. Patent that purported covered the C-1001 product had been issued, and the '288 Patent was expired.

73.     Upon information and belief, at least as early as August 15, 2015, Tektite and Mele were associated with the Sirius Defendants as the Sirius Web Site listed Tektite as a distributor at least as early as that date, and, upon information and belief, Mele is the owner of Tektite.

74.     As early as September 14, 2015, the Sirius Defendants advertised its C-1001 product as the *only* USCG-certified  alternative to a pyrotechnic flare.

75.     On December 31, 2015, Weems and Sirius entered into the Agreement for distribution of eVDSDs, which Weems believed were patented devices, and pursuant to which Weems would have an exclusive license to manufacture, distribute, advertise, publicize, market and sell the Licensed Products (as defined below) (the "License") and other rights including, without limitation, the Right of First Offer pursuant to Section 6 of the Agreement (the "Exclusive Rights") in exchange for Weems making a substantial upfront payment to Sirius of

two hundred thousand dollars ($200,000) and paying significant ongoing royalties to Sirius (initially thirty percent) on sales of the Licensed Products (collectively, the "Agreement Payments").

76.     At the time the Agreement was negotiated with Weems, the C-1001 product was falsely marked with at least "D720,247" as a part of the conspiracy to inflate the prices of the C-1001 and to induce Weems into signing the Agreement and paying excessive Agreement Payments due to the false belief that the C-1001 product was patented, that Weems was obtaining an exclusive license to valid and enforceable patents, and that a license was required to sell the C-1001 and enter the eVDSD market.

77.     During negotiation of the Agreement, Covelli knowingly misrepresented that the C-1001 was patented, and that additional patents were being pursued, in order to induce Weems to execute and perform the Agreement, including payment of the Agreement Payments.

78.     Covelli knowingly directed W&P to falsely mark the products with the numbers of patents that: 1) were expired; 2) did not cover the product; and 3) which neither Covelli, Simons, nor Sirius owned or licensed.

79.     Section 12b. _Governing Law_ of the Agreement executed by Sirius and Weems states, "This Agreement and the rights and obligations of the parties under it are governed by and interpreted in accordance with the laws of the State of Maryland (without regard to principles of conflicts of law)."

80.     The Third Amendment of the Agreement states in Section 8 Binding Agreement, "The Agreement as modified herein shall be binding on and inure to the benefit of the … legal representatives, … owners, … members, … and any other person or entity claiming under or through the parties."

81.      Covelli and Simons are legal representatives, owners, and members of Sirius, and Covelli personally signed the Third Amendment, thereby personally binding himself and Simons and making the Agreement binding on them as individuals.

82.      The Third Amendment further states in Section 9 <u>Authority to Execute</u>, "The parties to the Third Amendment and the Agreement as modified warrant, covenant and agree that the persons executing this Agreement are authorized and empowered to enter into and execute this Agreement as modified for and on behalf of the person or entity they represent, and that by their execution of the Agreement, each respective person or entity they represent, and all persons, partnerships, corporations, joint ventures and any person or entities affiliated with them, shall be bound by the terms of this Agreement."

83.      Covelli signed the Third Amendment and was authorized and empowered to personally bind himself and Simons, as individuals, thereby making the Agreement binding on them individually.

84.      "Know-How" is defined in the Agreement, as amended, to "have its usual and accepted meaning such as, by way of example, but not of limitation, all factual knowledge, proprietary information, trade secrets, procedures, processes, methods, designs, discoveries, inventions, patent application, licenses, software and source code, programs, prototypes, techniques, ideas, concepts, data, engineering, manufacturing information, techniques, ideas, concepts, data, engineering, manufacturing information, specifications, diagrams, schematics, or rights or works of authorship, that give to the one acquiring it an ability to study, test, produce, formulate, manufacture or market the SOS Distress Light SOS A-1001 sold by Sirius or variations thereof, which one otherwise would not have known how to study, test, produce, formulate, manufacture or market in the same way." Although the Agreement refers to an A-

1001, upon information and belief, the A-1001 was never manufactured and sold and the product number used in commerce for the intended A-1001 was C-1001.

85.     "Licensed Products" are defined in the Agreement, as amended, to include, *inter alia*, "[a]ny product made, used, sold, imported or offered for sale that includes or is covered by any of the Patents or Know How."

86.     "Patents" are as defined in the Agreement, as amended, and include "(b) all current and future patents related to the SOS Distress Light SOS A-1001 sold by Sirius or variations thereof that may be granted thereon [and] (c) any future patents and/or patent applications owned by Sirius and covering one or more aspects of the SOS Distress Light SOS A-1001 sold by Sirius as of December 30, 2015 or variations thereof."  As such, the patents licensed under the Agreement include all of the Sirius IP including any future patents for the C-1002.

87.     In executing the Agreement, the Sirius, Covelli, and Simons unlawfully sought to do more than that which would have been authorized by a limited monopoly due to its patents (if in fact the patents were valid) by requiring, in Section 4 of the Agreement, entitled "Covenants of W&P", that Weems, and subsequently W&P, covenant that it "will not manufacture, sell, or distribute any products that perform the same or a similar function as the Licensed Products other than the Licensed Products."  This provision of the Agreement served anti-competitive purposes because it sought to restrain Weems and W&P from activities that were not purportedly prohibited by the Licensed Patents.

88.     At least as early as April 24, 2018, Orion began offering an Electronic SOS Beacon Locator Kit, which was/is manufactured and sold by Orion and includes an eVDSD and a flag (the "Orion Kit").

89.     On approximately April 30, 2018, Orion notified Sirius and Weems via a letter

(the "Orion Letter") that the C-1001 Kit included packaging with "incorrect statements" relating

to its claim that it is the "ONLY ELECTRONIC FLARE that meets U.S. Coast Guard

Requirements" and that it is "the ONLY ALTERNATIVE to traditional flares" (emphasis in the

original). Orion further indicated that the Weems Web Site indicated that the "SOS Distress

Light is the ONLY LED Visual Distress Signal Device that meets U.S. Coast Guard

requirements to completely replace traditional pyrotechnic flares" and that this was also an

incorrect statement, and asserted that these "statements violate Section 43(a) of the Lanham Act

in that they are false and misleading statements of fact that misrepresent the characteristics and

qualities of both your company's and Standard Fusee's products."

90.     Upon information and belief, in response to the Orion Letter, Sirius and Weems

phased out all use of this language.  Further, at that point in time, it was determined that Orion

did not infringe upon any of the issued patents in the Sirius IP, but it was understood by Weems

that patents were being pursued upon which the Orion Kit would infringe.

91.     Upon information and belief, prior to the purported termination of the Agreement,

at least the Sirius Defendants held discussions about the termination of the W&P Agreement and

the potential licensing of the Sirius IP to Orion in violation of W&P's Right of First Offer

pursuant to Section 6 of the Agreement which states "[i]f at any time during the Term and for a

period of one (1) year thereafter, (i) Sirius shall desire to sell, transfer, assign or otherwise

convey, whether in whole or in part, the Know-How related to the Licensed Products, or (ii)

Sirius shall desire to grant control of Sirius to a person or entity other than to W&P, or (iii) Sirius

shall desire to grant licenses for other technologies, patents, trademarks, or products that it may

from time to time develop, Sirius agrees that it shall provide W&P with sufficient notice of any

such sale or licensing opportunity to permit W&P to enter into discussions with Sirius

concerning such opportunity and Sirius further agrees that it shall in good faith review any

reasonable written offer by W&P concerning any such opportunity.  The term of this Section 7

[sic] shall survive the expiration or earlier termination of this Agreement" (the "Right of First

Offer").

92.     At some point prior to purported termination of the Agreement by Sirius, without

the prior knowledge of W&P, the Sirius Defendants and Orion engaged in discussion about at

least the license of a portion of the Sirius IP without offering W&P the Right of First Offer, in

violation of at least Section 6 of the Agreement.

93.     Upon information and belief, at least prior to the purported termination of the

Agreement, the Sirius Defendants were conspiring to take all C-1001 business from W&P by

advertising the C-1001 as a discontinued product and advertising the new C-1003 as the

replacement for the C-1001.

94.     Upon information and belief, the Sirius Defendants conspired to deceive

consumers and retailers into believing that the C-1001 was phased out, and the C-1003 was

needed to replace it and stay current with the USCG Regulations when in reality, this was just an

excuse to divert business from W&P to the Tektite/Sirius Defendants and to increase profits for

Emlinq via its manufacturing of the circuit boards for same.

95.     On April 23, 2019, the Sirius Defendants asked W&P to execute an amendment to

the Agreement (the "Fourth Amendment") in which, *inter alia*, the exclusive license would be

amended to become a non-exclusive license, and Sirius would have the rights to license its

purported Sirius IP to any party. Upon information and belief, the Sirius Defendants intended to

create a monopoly by converting W&P to a non-exclusive agreement to allow the Sirius

Defendants to place Orion under license to its fraudulent patents so that it would obtain a monopoly in the eVDSD market.

96.      On April 26, 2019, Flanagan held a call with Covelli in which Flanagan indicated that the amendment was not acceptable in its current form, to which Covelli responded that if the amendment was not acceptable in its current form, Flanagan would need to negotiate an agreement for the license of the new multi-colored light contemporaneously with negotiation of the amendment, the new license to include an upfront payment of $275,000.  Flanagan confirmed this conversation in writing on Monday, April 29, 2019 and asked for a proposal for the multi-colored light.

97.      On May 1, 2019, Covelli replied that "[i]n order to work the model through I need to know what you are proposing in regard to a royalty reduction in our current agreement."  In other words, the negotiation of the royalty and other terms of the licensing of the C-1001/C-1003 was dependent upon W&P licensing the C-1002 multi-colored light under favorable terms to Sirius, and as such, Covelli could not price the license for the C-1002 without knowing the fees to be paid to license the C-1001/C-1003.

98.      On May 24, 2019, the Sirius Defendants again asked W&P to execute an amendment to the Agreement in which, *inter alia*, the exclusive license would be amended to become a non-exclusive license, and Sirius would have the rights to license its purported Sirius IP to any party.

99.      On May 29, 2019, Flanagan replied with a marked up amendment in which Sirius would only have the rights to license the Sirius IP to one other party, namely Orion.

100.      On June 1, 2020, Covelli texted Flanagan that he "sent your amendment to Annapolis counsel."

101.     On June 10, 2020, Covelli held a phone call with Flanagan in which he refused to execute the Fourth Amendment unless W&P simultaneously licensed the C-1002 including an upfront payment of $275,000.

102.     The following day, Sirius followed up with a written offer to W&P for a license to the C-1002 in exchange for an upfront payment of $275,000 plus ongoing royalties despite the fact that the C-1002 is a Licensed Product.   If for any reason the multi-colored light is not considered to be a Licensed Product, then Sirius is in breach of the express terms of the Agreement, because, upon information and belief, Sirius negotiated with at least Orion to license, the new, multi-colored light prior to  offering this opportunity to W&P in violation of W&P's Right of First Refusal.

103.     Even when Sirius eventually did purportedly offer the C-1002 to W&P on June 11, 2019, Sirius did so without providing support for projected sales or other material information, such as estimated manufacturing costs, which would be critical for W&P to make an informed decision.  Sirius then retracted the offer while refusing to provide the additional information, thereby further depriving W&P of its Right of First Offer.

104.     Upon information and belief, the Defendants conspired to cut off the supply of circuit boards and finished C-1001s to W&P in an effort to effectuate the diversion of W&P's business to Sirius, and this conspiracy was carried out prior to, and after, the date upon which Sirius contends the Agreement was terminated.

105.     On June 26, 2019, Covelli sent a letter to W&P declaring that "we have chosen not to renew the licensing agreement when it expires on December 31 of this year" (the "First Declaration of Intent to End Agreement"). There was no mention by Covelli of any alleged breach of the Agreement by W&P in the First Notice of Intent to End Agreement.

106.     On July 26, 2019, Covelli wrote another letter to Flanagan alleging that (a) W&P had breached the Agreement and (b) the Agreement would terminate on August 25, 2019 (the "Second Declaration of Intent to End Agreement"). The July 26, 2019 letter was the first time Covelli notified W&P that the Sirius Defendants considered W&P in breach of the Agreement.

107.     On July 2, 2019, Covelli confirmed to Flanagan that "there was no going forward with Weems & Plath" because he was licensing the Sirius IP to Orion.  Flanagan restated these sentiments in an email to Covelli a few days later on July 8, 2019, and he did not refute them.

108.     It is well established that a patentee's termination of a licensee in concert with a competing licensee as occurred in this case, is not entitled to an antitrust exemption.  The patent system has no interest in permitting the patentee's monopoly to be used as a screen for the maintenance of a horizontal cartel at the licensee level.  Defendants, in furtherance of their conspiracy and in breach of the Agreement, decided to terminate W&P in an effort to reduce the competition in the eVDSD marketplace from W&P and Orion, to solely Orion.

109.     On July 27, 2019, Covelli wrote a letter to Flanagan/W&P falsely accusing W&P of breaching the Agreement and further stating that "the breaches … are incapable of being cured" and "[a]s a result, the agreement will terminate on August 25, 2019."

110.     Upon information and belief, when Flanagan/W&P disputed the breach, the Defendants set out on a course of conduct to cease manufacturing and supplying W&P with the C-1001 and components thereof in order to prevent W&P from selling the C-1001 in accordance with its Exclusive Rights.

111.     Upon information and belief, the Defendants are now conspiring to further raise the cost of an eVDSD from approximately $89.99 (for a C-1003) to $299.95 (for a C-1002) via continuance of the aforementioned actions of the Conspiracy including, but not limited to,

agreeing to the acts of continuing to obtain fraudulent patents, and eliminating Sirius's sole competition (the Orion Kit) by attempting to license Orion under the false patents.

### i. Emlinq

112.    Emlinq is a circuit board manufacturer, from which Weems/W&P repeatedly, for a period of nearly four years, obtained circuits boards for use in the manufacturing of the C-1001, and with which Weems/W&P had an ongoing customer-supplier business relationship.  On July 16, 2019, W&P sent a purchase order to Emlinq, for five thousand (5,000) circuit boards for use in manufacturing the C-1001 (the "Emlinq Purchase Order").

113.    On July 29, 2019, Emlinq informed W&P that it had a call with Covelli regarding the Emlinq Purchase Order.

114.    Upon information and belief, in furtherance of the Sirius Defendants' activities to manufacture the Licensed Products, and in breach of the Agreement, Covelli, Simons, and/or Sirius placed an order with Emlinq for the same components that W&P had ordered from Emlinq.

115.    On July 29, 2019, for the first time in nearly four years, Emlinq informed W&P that it was "unable" (or implicitly unwilling) to fulfill the W&P order.

116.    Upon information and belief, Covelli is a close acquaintance of a representative of Emlinq, and Covelli conspired with the Emlinq representative and exerted inappropriate influence on Emlinq to interfere with the filling of the Emlinq Purchase Order.

117.    Upon information and belief, Covelli and Sirius made to Emlinq statements that were literally false and/or likely to mislead, confuse or deceive regarding W&P's rights to manufacture the Licensed Products, and Covelli's and Sirius's statements caused commercial

injury to W&P by harming W&P's ability to manufacture, and therefore sell, the Licensed

Products, including introducing inappropriate competition from Sirius in breach of W&P's

Exclusive Rights under the Agreement.

118.     Upon information and belief, because of Covelli's inappropriate influence on

Emlinq, Emlinq permanently stopped supplying the circuit boards to W&P.

119.     Without the additional circuit boards, W&P was limited in W&P's ability to

manufacture and sell the C-1001, including during a time period that Sirius does not dispute the

Agreement was still in effect and during the Sell-Off Period (as defined below).

### ii.  Tektite

120.     Tektite is a manufacturer of various products including lights and strobes, from

which Weems/W&P repeatedly has obtained C-1001s and with which Weems/W&P had an

ongoing customer-supplier business relationship for nearly four consecutive years.  After this

length of doing business, unexpectedly, on August 15, 2019, Tektite notified W&P that, for all

future orders, it would no longer accept customer supplied parts from W&P with the exception of

the clamshell insert card.

121.     On August 26, 2019, W&P sent purchase order 19-6009PO to Tektite for ten

thousand (10,000) SOS Body with Lens, "Complete Assembly includes packaging in supplied

clamshell, card insert and 15pcs per Master Carton)(i.e., for completely assembled C-1001s).

122.     Mele replied to the August 26, 2019 email and: 1) stated that it "can not

accept/confirm it at this time, as the price will be different;" 2) requested the contact information

for all suppliers of the floats and flags, with prior invoices; and 3) indicated that he was going

away and would not have a price until mid-September."

123.     After continued delay, Flanagan wrote to Mele on September 25, 2019 and asked him to provide W&P with the "boards and bodies (including the lens, cup with catalyst and contractor)" so that W&P could assemble the components.

124.     In a reply email of same date to Flanagan's September 25, 2019 email, Mele refused to provide the products and stated that the only way they would continue providing the C-1001 to W&P was if they provided "finished product pricing" despite the fact that they had never operated in this manner in the nearly four years of Weems/W&P's and Tektite's business relationship.

125.     On September 27, 2019, W&P supplied Mele with the names of its suppliers in an attempt to get a finished product price.

126.     On October 8, 2019, when Flanagan emailed Mele to follow-up, he said "I have not received any responses to my Sept. 27 RFQs to the 2 vendors.  This is not entirely unexpected due to the holiday week in China."

127.     When W&P followed up with one of the Chinese suppliers, Pan-U Ind. Co. Ltd ("Pan-U"), it was informed on October 13, 2019 that it had never received a request or RFP from Mele or Tektite.

128.     Upon information and belief, Mele wrote literally false statements to W&P for the purpose of deceiving it into believing it was working on a quote when in fact it was not, to delay production of the C-1001 and to avoid W&P finding another supplier because Mele and Tektite were conspiring with at least the Sirius Defendants to divert all of W&P's customers to Sirius by depleting the inventory of W&P by refusing to manufacture the C-1001.

129.     Upon information and belief, in furtherance of Covelli's and Sirius's activities to manufacture the Licensed Products, and in breach of the Agreement, Covelli placed an order with Tektite for the same components that W&P had ordered from Tektite.

130.     Flanagan had sent a letter to Mele and Tektite on August 7, 2019 advising them that such activities (i.e., manufacturing the C-1001 or components thereof for Sirius) would be a violation of W&P's rights, and asked Mele to notify him of any such activities. Upon information and belief, Mele did not notify Flanagan and instead proceeded to fill the order placed by the Sirius Defendants behind the back of W&P.

131.     Upon information and belief, Covelli is a close acquaintance of Mele, and Mele, Tektite, or both have a financial interest in Sirius and/or the profitability of the C Series Lights.

132.     Upon information and belief, at least Covelli conspired with Mele and Tektite and exerted inappropriate influence on them to interfere with W&P's order for the C-1001.

133.     At least on October 5, 2019, at least Covelli and Sirius made statements to Mele and Tektite that were literally false or likely to mislead, confuse or deceive regarding W&P's rights to manufacture the Licensed Products, and Covelli's and Sirius's statements caused commercial injury to W&P by harming W&P's ability to manufacture, and therefore sell, the C-1001, including, at a minimum, introducing inappropriate competition from Sirius in breach of W&P's Exclusive Rights under the Agreement.

134.     Because of Covelli's inappropriate influence on Tektite, Tektite refused to do business with W&P on its regular terms and greatly increased the cost to W&P for supplying the C-1001.