135.    Without the additional C-1001 supply, W&P was limited in W&P's ability to manufacture and sell the C-1001, including sale of its C-1001 inventory during the Sell-Off Period (as defined below).

### iii. Customer A

136.    Weems/W&P have been selling the C-1001 to Customer A since around 2015. Weems/W&P have had business and contractual relations with Customer A since at least the middle of the 1970s, and W&P reasonably has an expectation of ongoing prospective business and contractual relations with Customer A.  Customer A is representative of W&P's customers similarly impacted by the Defendants', which have put W&P's customers in the middle of the dispute between the Plaintiff and Defendants.

137.    Prior to August 25, 2019, Covelli informed Customer A that Customer A would no longer be able to obtain the Licensed Products from W&P and that Customer A would need to buy from Sirius the Licensed Products manufactured by Sirius.

138.    Covelli's assertion to Customer A is untrue.  Covelli's untrue comments to at least Customer A constitute fraud, deceit, trickery, bad faith, and/or unfair methods.  Upon information and belief, Covelli made to Customer A statements that were literally false and/or likely to mislead, confuse or deceive regarding W&P's rights to manufacture the Licensed Products, and Covelli's statements caused commercial injury to W&P by harming W&P's ability to sell the C-1001 and potentially other products to Customer A, including introducing inappropriate competition from Sirius in breach of W&P's Exclusive Rights.

139.    Even if the Defendants contend that the Agreement ended on August 25, 2019, Section 11 of the Agreement states that: "Upon the termination or expiration of this Agreement

36

for whatever reason, W&P … shall be able to continue to sell, on a non-exclusive basis, existing

Licensed Products [in] inventory…." This period is defined herein as the "Sell-Off Period."

140.     Covelli's and Sirius's actions caused at least Customer A to stop buying the

Licensed Products from W&P, causing W&P to lose existing and future sales to at least

Customer A of the Licensed Product and potentially other products.  Customer A has indicated to

W&P that so long as there is a dispute over whether W&P has the right to manufacture and sell

the Licensed Products, Customer A will not buy the Licensed Products from W&P or Sirius,

however, upon information and belief, Customer A has continued to purchase eVDSDs from

Orion.

### Count I – Breach of Contract

### (Plaintiff against Sirius Defendants)

141.     W&P repeats and re-alleges each of the foregoing and following allegations as

though fully set forth herein.

142.     The Agreement between W&P and Sirius is a contract and forms the basis of a

contractual relationship between W&P and the Sirius Defendants.

143.     The Sirius Defendants and Weems/W&P, for valuable consideration, entered into

an Agreement on December 31, 2015 (with three subsequent amendments) to grant

Weems/W&P "an exclusive license … in and to the Know-How with respect to the Patents and

the Trademarks to manufacture, distribute, advertise, publicize, market and sell Licensed

Products to consumers and retail entities" in return for the Agreement Payments from

Weems/W&P to Sirius.

144.     As set forth herein with reference to specific sections of the Agreement, the Sirius

Defendants have breached numerous provisions of the Agreement as set forth in this section,

causing damage to W&P financially and non-monetarily including, at a minimum, W&P's reputation and W&P's goodwill.

145.     Pursuant to the Third Amendment that Covelli personally signed, Covelli personally bound himself and Simons by the Agreement and made the Agreement binding on him and Simon, by virtue of Covelli and Simons being any of a "legal representatives … owners … members" of Sirius.

146.     As members and owners of Sirius, Covelli and Simons are not employees of Sirius, Covelli and Simons are distinct from the legal entity Sirius, and Covelli, Simons, and potentially others have used Sirius to act as their agent in conduct described herein.

147.     Being personally bound by the Agreement, Covelli and Simons have breached the Agreement with W&P, as individuals, and through the intentional and improper actions of Sirius as Covelli's and Simons' agent and of Covelli and Simons on behalf of and/or in concert with Sirius, described above with respect to at least Orion, Emlinq, and Customer A and the breaches set forth below.

148.     Covelli's and Simons' actions as individuals, and through the intentional and improper actions of Sirius as Covelli's and Simons' agent and of Covelli and Simons on behalf of and/or in concert with Sirius described above, have violated W&P's rights under the Agreement and impaired W&P's ability to obtain the full benefits of the Agreement.

## Breach of Implied Covenant of Good Faith and Fair Dealing of the Agreement

149.     The Sirius Defendants breached an implied covenant of good faith and fair dealing by knowingly misrepresenting that the C-1001 was patented, in order to induce

Weems/W&P to execute and perform the Agreement, including Weems/W&P making Agreement Payments for sales of the Licensed Products.

150.     The Sirius Defendants breached an implied covenant of good faith and fair dealing by knowingly misrepresenting that patents obtained, owned, and/or claimed to be owned by Sirius were valid when, in fact, it knew that they were invalid due to fraud, inequitable conduct, and violation of the duty to disclose material art to the USPTO.

151.     The Sirius Defendants have breached an implied covenant of good faith and fair dealing by threatening to not renew the Agreement if W&P did not license a new, multi-colored light and pay a significant upfront payment of $275,000 (in addition to the initial upfront payment of $200,000 paid for the initial Agreement).  Assuming arguendo that Sirius's claim is correct that the multi-color light is not a Licensed Product covered under the Agreement, Sirius breached its duty of good faith and fair dealing regarding the Agreement by improperly attempting to tie continuation of the existing Agreement to W&P's acceptance of the newly-proposed license agreement to the multi-colored light.  Nothing in the Agreement requires W&P to license new products as a condition to continuing to license the existing products.

152.     Conversely, assuming, as W&P does, that that the multi-color light is a Licensed Product covered under the Agreement, the Sirius Defendants breached its duty of good faith and fair dealing regarding the Agreement by improperly attempting to tie continuation of the existing Agreement to W&P's acceptance of the newly-proposed, unnecessary, and exorbitant license agreement to the multi-colored light, for which W&P already has a license under the Agreement. Beyond improperly attempting to tie continuation of the Agreement to acceptance of the unnecessary license, Sirius's demand that W&P pay an extra exorbitant upfront fee to license the new multi-color light is in breach of good faith and fair dealing, because the multi-colored light

falls under the definition of Licensed Products, is thus already part of W&P's License, for which a previous upfront fee already had been paid, and pursuant to which royalties on sales of the multi-colored light would accrue on behalf of Sirius just as sales of the existing products do already.

153.      The Sirius Defendants also breached an implied covenant of good faith and fair dealing by fabricating the unsubstantiated claim that W&P breached the Agreement as a basis for its Second Declaration of Intent to End Agreement. The Sirius Defendants only made this claim after the Sirius Defendants realized that they had no legal justification for the First Declaration of Intent to End Agreement, and the First Declaration of Intent to End Agreement was sent to W&P only after and because W&P declined to accept Sirius's demands that W&P enter into a separate license agreement for the new multi-color light and pay an enormous upfront fee, which is not a valid basis for terminating the Agreement.

## Breach of Section 2 of the Agreement

154.      Under Section 2a of the Agreement (listed as Section 3 in the First Amendment to the Agreement, but still referred to as Section 2 within the amended section), W&P has the exclusive right to "manufacture, distribute, advertise, publicize, market, sell, offer for sale and/or import Licensed Products" which is a part of W&P's Exclusive Rights.

155.      In breach of W&P's Exclusive Rights under the Agreement, prior to August 25, 2019, at a minimum, the Sirius Defendants undertook activities to manufacture the Licensed Products by, at a minimum, the Sirius Defendants having ordered floats from one of W&P's suppliers, Pan-U, for use in Tektite's manufacturing of the Licensed Products.

156.      In further breach of W&P's Exclusive Rights by the Sirius Defendants, prior to August 25, 2019, Sirius contacted third parties, including but not limited to, Emlinq to

manufacture circuit boards for the Licensed Products for Sirius, for use in Tektite's manufacturing of the Licensed Products.

157.     In further breach of W&P's Exclusive Rights by the Sirius Defendants under the Agreement, Sirius has been marketing Sirius-manufactured Licensed Products to at least one of W&P's customers, including Customer A, in an attempt to divert sales from W&P to Sirius and make direct sales to these customers of Licensed Products.  Customer A is representative of W&P's customers similarly impacted by the Defendants' activities, which have put W&P's customers in the middle of the dispute with Plaintiff and Defendants, thereby damaging W&P's goodwill and reputation.

158.     In further breach of W&P's Exclusive Rights by Sirius under the Agreement, on August 26, 2019, Sirius published a press release announcing, "the upcoming launch of its dual color eVDSD model C-1002 device and the updated C-1003 model, both of which will be manufactured and distributed exclusively by Sirius Signal." The press release continues that these models "are currently undergoing testing and certification."

159.     The C-1002 and C-1003 devices are Licensed Products in accordance with the terms of the Agreement.

160.     In further breach of W&P's Exclusive Rights by Sirius under the Agreement, the Sirius Defendants offered and continue to offer C-1003s for sale, and, in doing so, disparage the C-1001 sold by W&P by marketing the new model C-1003 as a replacement that "promises to be vastly more effective than the current white light models," wherein the current white light models are the C-1001 sold by W&P.  As such, the Sirius Defendants are implying that the W&P C-1001 product is outdated, inferior, and less effective.  Even if the Agreement is deemed to have an early termination date, the Sirius Defendants are well aware that these statements affect

the ability of W&P to sellout its inventory during the Sell-Off Period as per the terms of the Agreement.

161.     Section 2a of the Agreement also states that "Sirius shall in a timely manner make available to W&P such materials as may be necessary or desirable for use in exercising W&P's rights hereunder."

162.     In breach of these express terms of Section 2a of the Agreement, in an attempt to frustrate W&P's ability to manufacture the products, Emlinq and the Sirius Defendants have refused, and continue to refuse, to provide manufacturing specifications for the Licensed Products to W&P, including, but not limited to, circuit board design specifications, known as "Gerber" files ("Gerber Files"), which are necessary to manufacture the circuit boards.

### Breach of Section 3 of the Agreement

163.     Section 3 of the Agreement states, in part, that "[t]he parties agree to renew for additional twenty-four (24) month periods thereafter … unless one party after a mandated negotiation at the end of the prior term gives the other party sixty (60) days' notice to terminate the Agreement. In this way, the License could be for the life of the patents…."

164.     The Agreement was amended in Section D of the Third Amendment to state that the Agreement "will automatically renew" unless intentionally terminated by 60-days' notice and only then, after a "mandated negotiation."  Section 2 of the Third Amendment states that "prior to renewal of a 'Term' in Section 3 under the Agreement, in order to terminate the 'Initial Term' or a 'Renewal Term', the 'mandated negotiation' prior to the termination must occur at least sixty (60) days prior to the end of the 'Term', and each party must give the other party sixty (60) days [sic] notice to terminate the 'Term' prior to the end of each 'Term', unless agreed by the parties in writing."

165.     In breach of these express terms of the Agreement, Sirius violated Section 3 of the Agreement by not performing the required "mandated negotiation" prior to declaring the termination of the Agreement.

### Breach of Section 5 of the Agreement

166.     Section 5 of the Agreement states that "Sirius will not license to any party other than W&P, to manufacture, sell or distribute any products that perform the same or a substantially similar function as the Licensed Products."

167.     In breach of Sirius's obligations under Section 5, Sirius negotiated with at least one third party, Orion to license the Sirius IP to Orion.

168.     In breach of Sirius's obligations under Section 5, Sirius negotiated with at least Orion to license the new multi-colored light.

169.     In breach of Sirius's obligations under Section 5, Sirius gave at least Orion an implied license to sell Licensed Products by not enforcing the patents against Orion.

170.     In breach of these express terms of the Agreement, Sirius has thus effectively licensed rights to manufacture and sell the Licensed Products to Orion by failing to enforce the Sirius IP, and has not decreased the cost paid by W&P to Sirius accordingly despite the fact that W&P effectively had a non-exclusive license to manufacture and sell the Licensed Products since the introduction of the Orion Kit in 2018.

### Breach of Section 6 of the Agreement

171.     Section 6 of the Agreement gives W&P a Right of First Offer to any new technologies or products developed by the Sirius Defendants that are not Licensed Products.

172.     Upon information and belief, Sirius negotiated with Orion to make the multi-colored light before offering to W&P the opportunity to make the multi-colored light.  If for any

reason the multi-colored light is not considered to be a Licensed Product, then the Sirius

Defendants are in breach of the express terms of the Agreement, because the Sirius Defendants

negotiated with at least Orion to license, implicitly or explicitly, the new, multi-colored light

without first offering such opportunity to W&P.  Even when the Sirius Defendants eventually did

offer the new product to W&P, the Sirius Defendants did so without providing support for

projected sales or other material information, such as estimated manufacturing costs, which

would be critical for W&P to make an informed decision.  The Sirius Defendants then retracted

the offer while refusing to provide the additional information, thereby further depriving W&P of

its right of first offer.

173.     Upon information and belief, in breach of the express terms of the Agreement, the

Sirius Defendants negotiated with at least Orion to license, implicitly or explicitly, certain Know

How without first offering such opportunities to W&P.

### Breach of Section 8(c) of the Agreement

174.     Section 8c of the Agreement obligates Sirius to take diligent steps to enforce the

Patents against third parties.

175.     Section 8c of the Agreement states, in part: <u>Defense of Patents and Trademarks</u>.

In the event either party becomes aware of any infringement by a third party of the Patents or

Trademarks, Sirius shall, at its sole cost and discretion, take diligent steps, including, but not

limited to, filing a lawsuit or injunction if necessary, to protect and defend Sirius's rights to the

Patents and trademarks.

176.     Upon information and belief, at least Orion is selling a product that Sirius

indicates infringes at least one claim of one of the Patents.

177.     Orion's purported infringement of the Licensed Patents has been ongoing since on or about May 2018.

178.     W&P notified Sirius that such infringement was causing financial harm to W&P.

179.     W&P put Sirius on notice of the financial damage caused by Orion's purported infringement at least as early as October 2018.

180.     Upon information and belief, and in breach of the express terms of the Agreement, Sirius has not "take[n] diligent steps, including, but not limited to, filing a lawsuit or injunction if necessary," to prevent Orion from infringing the Licensed Patents.

181.     In breach of the express terms of the Agreement, Sirius has not brought a lawsuit against Orion or any other third party to prevent them from infringing the Licensed Patents.

182.     One of the benefits of the Agreement obtained by W&P in exchange for the Agreement Payments  is the exclusive right to manufacture, distribute, advertise, publicize, market, and sell the Licensed Products.

183.     Section 2a of the Agreement states that "Sirius understands and agrees that the representations and warranties set forth in this Section 2(a) are a material inducement to W&P entering into this Agreement."

184.     W&P has been damaged financially by Sirius not enforcing the Licensed Patents against Orion in the form of, at a minimum, lost sales.

185.     To the contrary, in clear breach of Sections 2a and 8c of the Agreement, Sirius is actively encouraging Orion to infringe the Patents by negotiating a license to the Sirius IP with Orion.

186.     Sirius's failure to "take diligent steps … to protect and defend Sirius's rights to the Patents" to the clear disadvantage of W&P also breaches Sirius's duty of good faith and fair dealing.

### Breach of Section 10 of the Agreement

187.     Section 10 of the Agreement provides a minimum of a 30-day window to cure any breach to the Agreement.  The minimum window to cure is 30 days, except in the case that the breach "is not capable of reasonably being cured within thirty (30) days." In such instance, the time for cure "shall be extended as reasonably necessary provided the defaulting party commences to cure such default within thirty (30) days and diligently prosecutes the cure to completion."  Likewise, nowhere does the Agreement provide Sirius with the right to unilaterally terminate either: (1) based on Sirius's unilateral perception that an alleged breach is "incapable of being cured;" or (2) before at least 30 days of notice have passed and the alleged breach has not been cured or corrected or begun to be cured or corrected.

188.     In the Second Declaration of Intent to End Agreement, Sirius stated that W&P allegedly had breached of the Agreement by selling to a distributor in Finland the Licensed Products with a red light that does not conform to USCG standards and by labeling these products with the same product number as those sold with a white light that does conform to USCG standards, despite the fact that Sirius, after extensive communications with W&P, approved the sale of this exact light to the Finnish distributor.

189.     In the Second Declaration of Intent to End Agreement, Sirius first instructed W&P, in three enumerated commands, to "Take all steps necessary" to cure specified aspects of the alleged breach.  Immediately thereafter, Sirius illogically, and in contradiction to the three enumerated commands, asserted that "[b]y their very nature, these breaches of the agreement are

incapable of being cured, much less cured within 30 days or within a reasonable time period." Sirius's own enumerated commands set forth how Sirius would propose to cure the alleged breaches, directly undermining and contradicting Sirius's claim that such "breaches of the agreement are incapable of being cured," clearly demonstrating, *inter alia*, Sirius's lack of good faith, in breach of Sirius's duty of good faith and fair dealing, and Sirius's breach of the cure provisions of Section 10.  Sirius's assertion of the unilateral discretion to deem an alleged breach to be "incapable of being cured" is itself a breach of the Agreement, as is Sirius's assertion that Sirius unilaterally may terminate the Agreement based on Sirius's perception of an alleged breach being "incapable of being cured."

190.     In addition to Sirius's breach of the Section 10 cure provisions, Sirius also fabricated the breach allegations by basing the unsupported allegations on illusory references to aspects of the Agreement.  In contradiction to Sirius's breach allegations, there is no express provision in the Agreement or in any other documentation that the Licensed Products are required to have a white light or to conform to USCG standards.

191.     There also is no requirement in any of the Sirius IP that the products described therein must have a white light or conform to USCG standards.

192.     Furthermore, Sirius approved the Finnish Light prior to the shipment of the Finnish Light to Finland.

193.     Nevertheless, although not in breach of the Agreement, in a sign of good faith, W&P submitted a plan to Sirius to address Sirius's concerns within the thirty-day cure period.

194.     In breach of the express terms of Section 10 of the Agreement, through the Second Declaration of Intent to End Agreement, Sirius is attempting to terminate the Agreement early, even though W&P had cured, or had commenced to cure, any alleged breach within 30

days of notification, and even though the breach allegations are not supported by any express terms of the Agreement, and as such, no express terms of the Agreement were breached.

195.    W&P has complied with its obligations under the Agreement.  Nonetheless, Sirius has interfered with W&P's sales of the Finnish Light and W&P's relationships with W&P's customers purchasing the Finnish Light.

196.    The Sirius Defendants' tortious actions in breach of the Agreement have damaged or will damage W&P financially in an amount exceeding $75,000.

## **Count II – Unfair Competition**

### **(Plaintiff Against All Defendants)**

197.    W&P repeats and re-alleges each of the foregoing and following allegations as though fully set forth herein.

198.    Through the actions set forth above with respect to at least Orion, Emlinq, and Customer A, Defendants have damaged, impaired, and/or jeopardized W&P's business through fraud, deceit, trickery, bad faith, and/or unfair methods.  Upon information and belief, Defendants committed unfair competition inasmuch as: (1) Covelli personally interfered with the fulfillment of an order for five thousand (5000) circuit boards to be manufactured by Emlinq for W&P; (2) Emlinq refused to provide the circuit boards to W&P and instead provided circuit boards to Sirius in violation of the Agreement; (3) Mele and Tektite refused to provide C-1001s to W&P in accordance with their previously negotiated terms;; (5) the Sirius Defendants issued a press release on August 26, 2019 that was literally false and/or likely to mislead, confuse or deceive by leading consumers to believe that the Agreement had expired; (6) the Sirius Defendants issued a press release on October 22, 2019 that was literally false and/or likely to mislead, confuse or deceive stating that effective Jan 1, 2020, Sirius Signal will no longer license

or manufacture the model C-1001 and indicating that the "C-1003 will be available as a direct replacement for the light you currently carry";  and (7) at least these actions of the Defendants caused commercial injury to W&P by harming W&P's ability to manufacture and sell, the C-1001 during a time in which neither party disputes that the Agreement was in full force and effect and during the Sell-Off Period, such action including introducing inappropriate competition from Sirius in breach of W&P's Exclusive Rights under the Agreement.

199.     Due to the untrue communications to Customer A, and these Customers' reliance thereon, and the inability of W&P to manufacture and sell the C-1001 product, W&P's ability to: 1) sell the C-1001 to Customer A has been impaired; and 2) sell other products to Customer A has been jeopardized, because the inappropriate uncertainty caused by the Sirius Defendants' untrue communications has undermined these Customers' faith in W&P as a supplier.

200.     Also due to these untrue communications to Customer A and the Customers' reliance thereon, and the inability of W&P to manufacture and sell the C-1001 product, W&P's reputation and goodwill in the perspective of Customer A have been damaged by Defendants' actions, because Defendants' untrue communications have undermined these Customers' faith in W&P in general.

201.     The Defendants' tortious actions have financially damaged W&P in an amount exceeding $75,000.

### Count III - Tortious Interference with Business Relations/Expectancy

### (Plaintiff Against All Defendants)

202.     W&P repeats and re-alleges each of the foregoing and following allegations as though fully set forth herein.

203.     Defendants' actions described above have impaired W&P's ability to reliably and predictably obtain the circuit boards from Emlinq and the C-1001s from Tektite.

204.     When W&P is not able to obtain the circuit boards and the C-1001s, W&P is unable to manufacture the C-1001.  Therefore, Defendants' actions have impaired W&P's ability to reliably and predictably manufacture the C-1001, thereby damaging W&P's ability to sell the C-1001 and exercise W&P's Exclusive Rights under the Agreement.

205.     Defendants' actions described above were performed intentionally and were reasonably calculated to cause damage to W&P's business.  W&P has had ongoing business relations with Emlinq and Tektite, and but for Defendants' interference, W&P has had a reasonable probability of ongoing and future business opportunities with Emlinq and Tektite.

206.     Defendants' actions described above with respect to Emlinq and Tektite were done with the unlawful purpose to cause damage and loss to W&P, without right or justifiable cause.

207.     W&P has been damaged financially and reputationally from Defendants' actions described above with respect to Emlinq and Tektite.

208.     Due to Defendants' actions described above, W&P's ability to sell the C-1001 to its customers including, without limitation, Customer A has been impaired.

209.     Due to Defendants' actions described above, W&P's ability to sell other products to its customers including, without limitation, Customer A has been jeopardized.

210.     Defendants' actions described above with respect to Emlinq, Tektite, and Customer A were performed intentionally and were reasonably calculated to cause damages to W&P's business.  W&P has had ongoing business relations with Customer A, and but for

Defendants' interference, W&P has had a reasonable probability of ongoing and future business opportunities with at least Customer A.

211.     Defendants' actions described above with respect to Customer A were done with the unlawful purpose to cause damage and loss, without right or justifiable cause.

212.     W&P has been damaged financially and reputationally from Defendants' actions described above with respect to at least Customer A.

213.     Defendants' actions with respect to at least Emlinq and Customer A were wrongful or unlawful because they frustrated W&P's ability to perform W&P's Exclusive Rights under, and obtain the benefit of, the Agreement, to which Covelli and Simons personally bound themselves explicitly in the Third Amendment, and they breached an implied covenant of good faith and fair dealing.

214.     The Defendants' actions were additionally wrongful or unlawful because they breached Section 2 of the Agreement by: (1) violating W&P's exclusive license to advertise, publicize, market or sell the C-1001 to at least Customer A; and (2) attempting to advertise, publicize, market or sell to at least Customer A Licensed Products not purchased from W&P for resale.

215.     Defendants' actions intentionally have interfered tortiously with W&P's business and contractual relations with Emlinq, Tektite, and at least Customer A.  Defendants' actions intentionally have interfered tortiously with W&P's prospective business advantage with at least Customer A.  Namely, Defendants' actions have proximately caused W&P's ability to manufacture and sell the Licensed Products to decrease and have damaged W&P at least in terms of lost current and future sales, decreased product turnover, and associated decreased profits. Due to Defendants' tortious interference, W&P has been damaged financially and reputationally

in W&P's existing and prospective business relationships with Emlinq, Tektite, and at least

Customer A.

216.     Defendants committed tortious interference with W&P's business relations

inasmuch as: (1) W&P had beneficial business relations with at least Customer A, Emlinq, and

Tektite; (2) Defendants' knew of W&P's beneficial business relations; (3) Defendants' intended

to impair or cause a detriment to W&P's business relations; (4) Defendants' lacked any privilege

to impair or cause a detriment to W&P's business relations; (5) Defendants' impaired or caused a

detriment to W&P's business relations; and (6) Defendants' actions caused damage to W&P.

## Count IV – Civil Conspiracy by Defendants

### (Plaintiff against All Defendants)

217.     W&P repeats and re-alleges each of the foregoing and following allegations as

though fully set forth herein.

218.     Upon information and belief, Sirius was formed by Covelli and Simons in

California on March 05, 2015 and identified as entity 201506810315.

219.     Upon information and belief, no legal entity possibly associated with Sirius is

known to have existed prior the formation of Sirius on March 05, 2015.

220.     Upon information and belief, Sirius has as members, *inter alia,* Covelli and

Simons, who are the co-inventors listed on Sirius IP covered in the Agreement executed by

Covelli on behalf of Sirius.

221.     Upon information and belief, co-inventors Covelli and Simons claim to have

created the initial devices and initial technology associated with the Sirius IP, the earliest of

which was filed June 06, 2014, at least nine months before the formation of Sirius as a legal

entity on March 05, 2015.

222.      Upon information and belief, co-inventors Covelli and Simons initially owned the Sirius IP by act of law upon filing of the associated patent applications, in the absence of any written assignment assigning ownership thereof to a third party.

223.      Upon information and belief, co-inventors Covelli and Simons executed on April 06, 2016, and recorded with the United States Patent and Trademark Office ("USPTO") on June 11, 2018, a written assignment purporting to assign the '114 Patent to "Sirius Signal Co." of 1042 North El Camino Real, Suite B-200, Encinitas, CA 92024.  The '114 Patent is based on U.S. Patent Application 16004987 filed on June 11, 2018.

224.      Upon information and belief, co-inventors Covelli and Simons, executed on April 06, 2016, and recorded with the USPTO on April 11, 2016, a written assignment purporting to assign the '754 Patent to "Sirius Signal Co." of 1254 Scott Street, San Diego, CA 92106.  The '754 Patent is based on U.S. Patent Application 15095727 filed on April 11, 2016.

225.      Upon information and belief, co-inventors Covelli and Simons, executed on February 25, 2016, and recorded with the USPTO on March 07, 2016, a written assignment purporting to assign the '175 Patent to "Sirius Signal Co." and identified in the USPTO Assignment Records as "Asirius Signal Co." of 1254 Scott Street, San Diego, CA 92106.  The '175 Patent is based on U.S. Patent Application 29557241 filed on March 07, 2016.

226.      Upon information and belief, co-inventors Covelli and Simons, executed on February 25, 2016, and recorded with the USPTO on March 02, 2017, a written assignment purporting to assign the '920 Patent to "Sirius Signal Co." of 1254 Scott Street, San Diego, CA 92106.  The '920 Patent is based on U.S. Patent Application 29595834 filed on March 02, 2017.

227.      Upon information and belief, co-inventors Covelli and Simons, executed on January 05, 2019, and recorded with the USPTO on January 24, 2019, a written assignment

53

purporting to assign the '477 Patent to "Sirius Signal, LLC" of 1042 North El Camino Real,

Suite B-200, Encinitas, CA 92024.  The '477 Patent is based on U.S. Patent Application

29638591 filed on February 28, 2018.

228.     Upon information and belief, co-inventors Covelli and Simons, executed on April

06, 2016, and recorded with the USPTO on June 15, 2017, a written assignment purporting to

assign the '033 Application, published as U.S. Patent Publication 20170349248, to "Sirius Signal

Co." of 1254 Scott Street, San Diego, CA 92106.  The '033 Application was filed on June 15,

2017.

229.     Upon information and belief, co-inventors Covelli and Simons, executed on April

06, 2016, and recorded with the USPTO on January 11, 2019, a written assignment purporting to

assign the '947 Application, published as U.S. Patent Publication 20190161149, to "Sirius Signal

Co." and identified in the USPTO Assignment Records as "Sirius Signal, LLC" of 1042 North El

Camino Real, Suite B-200, Encinitas, CA 92024.  The '947 Application was filed on January 11,

2019.

230.     Under California Code of Regulations (CCR) section 21001(d)(1)(B)&(G), the

unitary business entity identifiers "Co." and "Company" apply only to corporations, and not to

limited liability companies, in the absence of the words or abbreviations for "limited" and

"liability."

231.     Upon information, belief, and a diligent search, "Sirius Signal Co." does not exist

as a legal entity in California or elsewhere.

232.     Upon information, belief, and a diligent search, "Sirius Signal, Inc." does not

exist as a legal entity in California or elsewhere.

233.	Upon information and belief, the patent assignments purporting to assign patents and patent applications to "Sirius Signal Co." are legal nullities and void, because "Sirius Signal Co." does not exist, either as a legal entity or as an assignee, and thus cannot own the purported assigned patents and patent applications.  Therefore, co-inventors Covelli and Simons retained their ownership of the assets purportedly assigned to "Sirius Signal Co." and remained the owners of those assets through at least 12/31/2019.

234.	Upon information and belief, co-inventors Covelli and Simons, know that "Sirius Signal Co." does not exist, and Sirius , as a legal entity, knows that "Sirius Signal Co." does not exist, at least by virtue of Covelli knowing that "Sirius Signal Co." does not exist.

235.	Upon information and belief, at least the Sirius Defendants knew that Sirius did not own at least a portion of the Sirius IP covered in the Agreement during the term of the Agreement and intentionally misrepresented to Weems/W&P that Sirius owned all of the Sirius IP.

236.	Upon information and belief, at least Covelli and Sirius intentionally misrepresented to Weems/W&P that the C-1001 was patented.

237.	Upon information and belief,  at least Covelli and Sirius intentionally misrepresented to Weems/W&P that it should falsely mark the products with the numbers of patents that did not cover the product.

238.	Upon information and belief, at least Covelli and Sirius intentionally misrepresented to Weems/W&P that patents obtained, owned, and/or claimed to be owned by Sirius were valid when, in fact, the Tektite/Sirius Defendants knew that they were invalid due to obviousness, fraud, inequitable conduct, inventor misrepresentation, submission of fraudulent statements to the USPTO, and violation of the duty to disclose material art to the USPTO.

239.     Upon information and belief, the Tektite/Sirius Defendants were all aware of the duty to provide all relevant material art to the USPTO, and Covelli and Simons signed a declaration that they would do so, and in violation of that declaration, both inventors intentionally failed to disclose at least the "Material Information" to the USPTO.

240.     In executing and purchasing the Agreement, Weems and W&P, respectively, detrimentally relied on at least Covelli's and Sirius' misrepresentation and omission of these material facts relating to the inventorship, ownership, scope, and validity of the Sirius IP, and in performing under the Agreement, Weems' and W&P's detrimental reliance on at least Covelli's personal material misrepresentations and omissions caused Weems and W&P to incur monetary damage by paying substantial Agreement Payments to license from Sirius the Sirius IP that is invalid, unenforceable, does not cover the distributed product, and a portion of which is not owned by Sirius.

241.     When W&P refused to pay an additional exorbitant licensing fee to the Sirius Defendants to license its new C-1002 light, the Tektite/Sirius Defendants conspired with Emlinq to stop W&P's production of the C-1001 light so that the Defendants could, *inter alia,* profit from the increase in sales of the C-1002 and C-1003 products either directly or in the form of being paid for an increase in production of the C-1001s or components thereof.

242.     As set forth above in the Facts section, Emlinq intentionally and knowingly denied a circuit board order placed by W&P after nearly four years of supplying circuit boards to W&P for the sole purpose of conspiring with the other Defendants to disrupt W&P's sale of the C-1001 Product.

243.     Emlinq further refused to supply W&P with the Gerber Files to allow them to place its circuit board order with another supplier despite Flanagan emailing Emlinq on August 2019 and demanding that Emlinq "immediately provide me all design files for the board."

244.     As set forth above in the Facts section, Mele and Tektite intentionally and knowingly delayed, raised the price of, and then denied a C-1001 order placed by W&P after nearly four years of supplying C-1001s to W&P for the sole purpose of conspiring with the other Defendants to disrupt W&P's sale of the C-1001 Product.

245.     Upon information and belief, Mele and Tektite also conspired to hide the fact that Mele or another individual associated with Tektite developed and invented the C-1001 from the USPTO, Weems, and W&P, to allow the Sirius Defendants to fraudulently re-patent the technology of its expired '288 Patent.

246.     Upon information and belief, the Defendants conspired to commit the Conspiracy Acts and other acts in order to carry out  the Conspiracy as set forth otherwise herein.

247.     Upon information and belief, the Defendants committed the tort of civil conspiracy by: (1) combining or agreeing with a common purpose to commit an unlawful act or do an otherwise lawful act by unlawful means, through the Conspiracy Acts and other overt acts described herein in furtherance of the Conspiracy; (2) committing the overt acts as described herein in furtherance of the common purpose, or Conspiracy; and (3) causing Weems and W&P to incur actual damages, including monetary damages of the Agreement Payments to license from Sirius the Patents that were obtained fraudulently, do not cover the scope of the distributed product, and at least a portion of which are not actually owned by Sirius, as well as lost profits from the inability to manufacture the C-1001 and reputational damage.

## **Count V – Tortious Interference with Contractual Relations**

## **(Plaintiff against all Defendants)**

248.     W&P repeats and re-alleges each of the foregoing and following allegations as though fully set forth herein.

249.     The Defendants committed tortious interference with W&P's contractual relations inasmuch as: W&P had beneficial contractual relations and a legally protected interest with at least Customer A (to sell product including the C-1001 thereto), Emlinq (to purchase circuit boards therefrom), Tektite (to purchase assembled C-1001s therefrom), and Sirius (the Agreement), and, upon information and belief, the Defendants knew of W&P's beneficial contractual relations and legally protected interest with each of these parties.

250.     The Defendants intentionally and willfully induced third parties to breach or otherwise render impossible the performance of the contract by: (1) the non-Emlinq Defendants intentionally and willfully conspired to induce Emlinq to refuse W&P's order for 5000 circuit boards;  (2) the non-Tektite Defendants intentionally and willfully conspired to induce Tektite to change the terms of its orders with W&P for the assembled C-1001s, to delay the provision of new terms of orders to W&P for the assembled C-1001s, and to quote unreasonable terms to W&P for orders of the assembled C-1001s; (3) all of the Defendants intentionally and willfully conspired to induce at least Customer A to cease doing business with W&P including, but not limited to, the making of false statements to Customer A, and/or for W&P to be unable to supply at least Customer A with the C-1001; and (4) all of the non-Sirius Defendants intentionally and willfully conspired to (i) deprive W&P of its Exclusive Rights pursuant to the Agreement including, without limitation, its exclusive rights to manufacture and sell the C-1001 and its Right of First Offer and (ii) to induce Sirius to breach the Agreement in multiple ways as set

forth  herein including, without limitation, breach of the Right of First Offer in its negotiations with Orion for license of the C-1002.

251.     The Defendants lacked any justification or privilege to impair, cause a detriment to, or cause a breach of W&P's contractual relations, and the Third Party Defendants impaired, caused a detriment to, and/or caused a breach of W&P's contractual relations in that W&P could not manufacture circuit boards, W&P could not manufacture C-1001s, W&P could not supply its customers with C-1001s, Sirius attempted to prematurely terminate the Agreement, and W&P's reputation with at least Customer A has been damaged.

252.     The Third Party Defendants' actions caused damage to W&P in the form of lost sales, damage to its reputation, and damaged relationships with at least Customer A.

253.     Due to the Tektite/Sirius Defendants as described above, W&P has been impaired at least in W&P's ability to obtain the full benefits of the Agreement by being unable to reliably and predictability manufacture or sell Licensed Products; and by the premature termination of the Agreement and the relationship with Sirius.

254.     W&P's reputation and goodwill have been damaged by the Defendants' actions.

255.     The Defendants tortious actions have damaged W&P financially in an amount exceeding $75,000.

## Count VI – Fraud

### (Plaintiff against Tektite/Sirius Defendants)

256.     W&P repeats and re-alleges each of the foregoing and following allegations as though fully set forth herein.

257.     Upon information and belief, at least the Sirius Defendants committed the tort of fraud, fraudulent inducement, and/or fraudulent misrepresentation by (1) making false

representations to Weems/W&P regarding the validity, scope, ownership, inventorship, and enforceability of the Sirius IP and Licensed Patents; (2) the falsity of the representations regarding the Sirius IP was either known to the Sirius Defendants or the representation was made with reckless indifference to its truth; (3) the misrepresentations were made for the purpose of defrauding Weems/W&P to induce them to execute the Agreement and make the Agreement Payments; (4) Weems/W&P relied on the misrepresentation after receiving the advice of patent counsel, and had the right to rely on them; and (5) Weems/W&P suffered compensable injury as a result of the misrepresentations including damages in the amount of the Agreement Payments, lost profits that W&P would have obtained if it had manufactured its own eVDSD, which it did not do due to the false belief that the eVDSD product it was exclusively licensing was patented, and damage to its reputation.

258.     Upon information and belief, Covelli and Simons knew that Sirius did not own at least a portion of the Sirius IP licensed pursuant to the Agreement during the term of the Agreement and intentionally misrepresented to Weems/W&P that Sirius owned all of the Sirius IP by executing the Agreement which stated that "Sirius is the owner of issued and pending U.S. and foreign patents."

259.     Upon information and belief, Covelli and Simons knew and intentionally misrepresented to W&P that the C-1001  was patented.

260.     Upon information and belief,  Covelli and Simons knew and intentionally misrepresented to W&P that it should falsely mark the C-1001 with the numbers of patents that did not cover the C-1001.

261.     Upon information and belief, Covelli and Simons knew and intentionally misrepresented to W&P that patents obtained, owned, and/or claimed to be owned by Sirius were

valid when, in fact, they knew that they were invalid due to fraud, the submission of fraudulent

inventorship statements to the USPTO, inequitable conduct, and violation of the duty to disclose

Material Information to the USPTO.

262.    Upon information and belief, co-inventors Covelli and Simons were both aware of

the duty to provide all relevant material art to the USPTO and  signed a declaration that they

would do so, and in violation of that declaration, both inventors intentionally failed to disclose at

least the Material Information to the USPTO.

263.    The Sirius Defendants led Weems to believe during the negotiations of the

Agreement that the C-1001 was covered by the Sirius IP.

264.    As part of Weems' due diligence in evaluating the Sirius IP, on December 13,

2015, Trogdon emailed Covelli to request extensive information regarding the Sirius IP.  In

response thereto, Covelli knowingly provided false information to Weems in writing in an email

to Trogdon dated December 17, 2015 (the "Due Diligence Email").  Specifically, Weems asked

Covelli for the "[n]ame of all associated parties in the design and development" of the C-1001

and Covelli falsely replied in writing with "Anthony Covelli Robert Simons" and did not name

Tektite, Mele, nor any other agent or employee of Tektite as an inventor of the C-1001, nor did

he name the inventor of the '288 Patent.   Weems also requested "[a]ll documents …related to

the development of the product" to which Covelli replied "none" and failed to disclose the '288

Patent or any of the work done by Tektite.  This was done despite Mele stating in writing that he

is the designer of the C-1001.

265.    Upon information and belief, the Sirius Defendants falsely led Weems to believe

that the C-1001 was covered by the '247 Patent, the '288 Patent, and the '436 Patent by, at a

minimum, falsely marking the C-1001 with these product numbers and agreeing that Weems should also mark the C-1001 with these patent numbers.

266.     On December 15, 2015, when asked for marketing material for the C-1001 and presented with "Model C-1001 Patent D720.2475 6,168,288& Pend," Covelli approved the marketing material.

267.     The '247 Patent is a design patent that bears little resemblance to the C-1001. Indeed, Covelli, Simons, and Sirius acknowledged this lack of resemblance by later filing a new design patent application that issued as the '175 Patent, which does resemble the C-1001.

268.     At the time that Covelli made the misrepresentation to Weems regarding the '288 Patent, the '288 Patent did not cover anything because it had expired on January 28, 2013, for failure to pay maintenance fees, and neither Sirius, Simons, nor Covelli owned the '288 Patent.

269.     After pushback regarding the patent markings, on December 30, 2015, the day before the Agreement was executed, Covelli wrote in an email "[t]he device will carry singly the Sirius patent number "9,171,436 [sic]" to intentionally mislead Weems into believing that the C-1001 device was covered by the '436 Patent.

270.     Further, the '436 Patent did not pertain to the C-1001 product to be sold in accordance with the Agreement because all of the claims require a "floodable lower compartment."  The C-1001 never included any floodable compartment, lower or otherwise, and still does not include such a compartment.

271.     Covelli and Simons both also signed Declarations (37 CFR 1.63) for Utility or Design Application Using an Application Data Sheet ("Declarations") in their personal capacities as inventors of the Sirius IP.  All Declarations specifically state, "I hereby acknowledge that any willful false statements made in this declaration is punishable under 18

U.S.C. 1001 by fine or imprisonment of not more than five (5) years or both" and "I believe that I am the original inventor or an original joint inventor of a claimed invention in the application."

272.     Upon information and belief, Covelli and Simons committed fraud in execution of all of the Declarations associated with the Sirius IP because Covelli and Simons knew that they were not "the original inventor or an original joint inventor" of the Sirius IP.

273.     The invention disclosed in the Sirius IP includes an On/Off Lens Switch, which is identical or nearly identical to the switch disclosed in the '288 Patent, which lists, on its face, an inventor of Christian P. St. Claire, and which has been assigned to Tektite.

274.     Without discovery, W&P cannot determine the exact date upon which the Sirius Defendants learned of the '288 Patent, but Covelli was aware of the '288 Patent, and its relevance and materiality to the C-1001 product and the Sirius IP, at least as early as December 18, 2015 as evidenced by an email exchange between Trogdon and Covelli that occurred on that same date in which Covelli led Trogdon to believe he should mark the C-1001 product with the '288 Patent (the "288 Email").

275.     The Sirius Defendants were likely aware of the '288 Patent much earlier than December 18, 2015 as Tektite was listed as one of Sirius's distributors on the Sirius Web Site at least as early as August 15, 2015.

276.     Despite having personal knowledge of the '288 Patent and other Material Information relevant to the Sirius IP at least as early as December 18, 2015 and having the knowledge that they did not invent the Sirius IP, Covelli and Simons committed fraud on the USPTO as described in detail in Count IX of this Complaint.

277.     Covelli and Simons committed this fraud personally, as their duty to disclose the Material Information to the USPTO, to disclose true inventorship, and to refrain from submitting

false documents to the USPTO, arose in their personal capacities as inventors and did not arise pursuant to their positions within, or ownership of Sirius.

278.     Covelli and Simons retained ownership of the Sirius IP as individuals for months or years after the individual filings thereof, and as such, these omissions and actions occurred in their personal capacities as personal owners of the respective patents and patent applications.

279.     The duty to disclose only pertains to prior art of which the inventors are aware, and Covelli and, upon information and belief, Simons, as individuals, were the only one in a position to know that they had personal knowledge of the '288 Patent and its materiality to the Sirius IP at the time they were obligated to disclose it to the USPTO.

280.     At least Covelli committed fraud in the inducement when negotiating the Agreement with Trogdon.

281.     During negotiation of the Agreement, Trogdon consulted with his intellectual property counsel, Mr. Brian Belles ("Belles"), regarding the patents to be licensed, and Belles raised concerns regarding the enforceability and scope of the '247 and '436 Patents.

282.     Trogdon communicated those concerns to Covelli, who shared them with his patent attorney, Mr. Richard Clarke ("Clarke").

283.     Clarke disagreed with Belles' assessment of the '247 and '436 Patents and emailed Covelli to say that, either way, Clarke was bolstering the Sirius IP through the pursuit of a new continuation-in-part application ("CIP") and a new design patent application which matured into the '754 Patent and the '247 Patent (the "Bolstering Patents").  Covelli shared this information with Trogdon on December 30, 2015 in an attempt to induce Trogdon to execute the Agreement.

284.     Covelli knew that these statements were false at the time they were made as he knew the Bolstering Patents would not bolster the portfolio because they would also be unenforceable due to his and Simons' intended future fraud on the USPTO and the fraudulent statements that Covelli and Simons had submitted, and intended to keep submitting, to the USPTO during prosecution of these Bolstering Patents.

285.     In reliance upon Covelli's fraudulent statements, Trogdon executed the Agreement the very next day on December 31, 2015.

286.     Upon information and belief, Belles had no idea about the fraud being perpetrated on the USPTO by Covelli and Simons and, as such, he was not in a position to counsel Trogdon regarding such fraud.

287.     Weems did not learn that the C-1001 was not protected by any of the Sirius IP until it received an email from Belles on March 4, 2016, but, at this time, Weems believed that the Bolstering Patents would cure this deficiency because Sirius had retained Belles for this purposes.  At this time, Trogdon and Belles were unaware of the fraud on the USPTO and the resulting unenforceability of the Bolstering Patents.

288.     At the time the Agreement was executed on December 31, 2015, Covelli and Simons, and potentially Mele, were the only ones who knew that they had already committed fraud on the USPTO, and that they intended to continue to commit fraud on the USPTO, which rendered the licensed patents unenforceable and would render all future patents unenforceable.

289.     In executing and purchasing the Agreement, Weems and W&P, respectively, reasonably and detrimentally relied on at least the Sirius Defendants intentional misrepresentation of these material facts relating to the scope, validity, and ownership of the Patents.  In performing under the Agreement, Weems/W&P's detrimental reliance on Covelli's

and Simons' material misrepresentations caused Weems/W&P to incur monetary damage by paying substantial Agreement Payments for an exclusive license to Sirius IP that is invalid, unenforceable, does not cover the products distributed under the Agreement, and a portion of which are, or were, not actually owned by Sirius.

290.    The Sirius Defendants entered the Agreement without the intention of delivering an exclusive license to valid, enforceable patents covering the scope of the product to be distributed in accordance with the Agreement. As such, the Sirius Defendants induced Weems/W&P to part with at least the Agreement Payments by means of a promise which Sirius Defendants had no intention or ability to perform.

291.    Weems/W&P had no knowledge of the fraud and reasonably could not have discovered that fraud had been committed in the inducement and on the USPTO until at least November 27, 2020 (the "Fraud Discovery Date") at which time W&P's current intellectual property counsel, Rita Chipperson ("Chipperson"), discovered the '288 Email that disclosed: 1) the existence of the '288 Patent; 2) Covelli's knowledge of the '288 Patent; and 3) Covelli's knowledge of the '288 Patent's materiality to the C-1001 product.  Thereafter, Chipperson cross checked the '288 Email with the prosecution history of the Sirius IP to determine the failure to disclose the '288 Patent to the USPTO, and subsequently notified Flanagan and, therefore, W&P of the fraud.

292.    On the date that the original Agreement was executed, neither Weems nor Belles knew, or reasonably could have known, that the Sirius Defendants had committed fraud in the inducement, fraud on the USPTO and/or that the Sirius Defendants intended to continue committing fraud on the USPTO, thereby rendering the licensed patents unenforceable.

293.     With regards to fraud on the USPTO, the duty to disclose applies only if an inventor is aware of prior art *and* its materiality to the pending patent application, in which case such prior art must be disclosed to the USPTO at any point up until issuance of a patent.

294.     Even if Belles had knowledge of the '288 Patent, he would not have known that Covelli had knowledge of the '288 patent and that Covelli knew of the '288 Patents' materiality to the Sirius IP during the time period in which he was required to disclose the '288 Patent to the USPTO.

295.     It was reasonable for Trogdon to rely upon the advice of Belles as his intellectual property counsel in assessing the validity of the Sirius IP.

296.     After execution of the Agreement, Belles took over prosecution of the Sirius IP and filed Information Disclosure Statements for both the '754 Patent and the '114 Patent on April 11, 2016 and June 11, 2018, respectively, both of which did not include the '288 Patent.

297.     Belles also owes a duty of disclosure to the USPTO pursuant to 37 CFR 1.56, and it is unlikely that Belles would not have disclosed the '288 Patent to the USPTO if he was aware of it.

298.     Furthermore, fraud in the inducement occurred in the execution of each of the First Amendment, Second Amendment, and Third Amendment, which were executed on February 8, 2016, March 10, 2016, and August 18, 2017, respectively.  All of the patents referenced in the Agreement and its amendments are all unenforceable due to the fraud of the Sirius Defendants, and neither Trogdon, Weems, nor W&P were aware of the fraudulent conduct until at least the Fraud Discovery Date.

299.     The harm perpetrated by the Sirius Defendants is continuing in nature because Sirius repeatedly received on a monthly basis royalty payments for the licensing of invalid, unenforceable patents up until this Court granted the escrow of such royalties with the Court.

300.     Upon information and belief, Tektite and Mele committed the tort of fraud, fraudulent inducement, and/or fraudulent misrepresentations by making false representations to W&P regarding the status of W&P's orders to W&P, (2) the falsity of the representations was either known to Tektite and Mele or the representations were made with reckless indifference to its truth, (3) the misrepresentations were made for the purpose of delaying and preventing W&P from seeking another manufacturer for the C-1001, (4) W&P relied on the misrepresentation and had the right to rely on them, and (5) W&P suffered compensable injury as a result of the misrepresentations including damages in the amount of lost profits due to its inability to manufacture the C-1001 and damage to its reputation in not being able to supply the C-1001 to its customers.

301.     Upon information and belief, the false statements of Mele and Tektite include, but are not limited to, when Flanagan emailed Mele on October 8, 2019 to inquire about the status of his quote, Mele responded on the same day stating "I have not received any responses to my Sept. 27 RFQs to the 2 vendors.  This is not entirely unexpected due to the holiday week in China."  Mele knew this statement was false since, upon information and belief, Mele had never requested the RFQs from China because when W&P followed up with one of the Chinese suppliers, Pan-U, it was informed on October 13, 2019 that it had never received a request or RFP from Mele or Tektite.

## Count VII – Promissory Estoppel

### (Plaintiff Against Sirius Defendants)

302.     W&P repeats and re-alleges each of the foregoing and following allegations as though fully set forth herein.

303.     The Sirius Defendants are liable to W&P for equitable remedies under the doctrine of promissory estoppel because: (1) during negotiations of the Agreement with Weems, (2) Covelli, on behalf of himself personally, Sirius, and Simons, represented and promised that the Agreement "could be for the life of the patents" so long as it was "renewed every 24 months within the 24th month negotiations"; (3) Weems relied on Covelli's representations and promises in executing the Agreement, W&P relied on Covelli's representation in purchasing the Agreement, and both Weems/W&P relied on Covelli's representations in performing under the Agreement; (4) Weems' and W&P's reliance was to W&P's detriment, including payments of the substantial Agreement Payments and lost profits that W&P would have obtained if it had manufactured its own eVDSD, which it did not do due to the false belief that the eVDSD product it was exclusively licensing was patented; (5) Covelli and Simons failed to uphold the representations and promises by terminating the Agreement prior to the expiration of the life of the patents without cause and for fraudulent reasons as otherwise set forth herein including, without limitation, Covelli's actions in breach of Section 6 of the Agreement; and (6) it would be unfair, inequitable, and/or unconscionable for the Sirius Defendants to retain the benefits of the Agreement and/or the benefits of early termination of the Agreement in view of the failure to uphold the representations and promises. Covelli and Simons benefit from the Agreement in light of their ownership interests and the distributions to them personally pursuant thereto.

304.     The Sirius Defendants are liable to W&P for equitable remedies under the doctrine of promissory estoppel, because: (1) during negotiations of the Agreement with Weems, (2) Covelli, on behalf of himself personally, Sirius, and Simons, represented and promised that Sirius would be able to grant, and would grant, to Weems an exclusive license to valid patents under the Agreement, the scope of which would cover the C-1001 product; and (3) Covelli, on behalf of himself personally, Sirius, and Simons, represented and promised that Sirius would maintain the exclusive license via enforcement of the patents licensed under the Agreement; (3) Weems relied on Covelli's representations and promises in executing the Agreement and performing under the Agreement, such performance including payment of significant Agreement Payments, and W&P relied on Covelli's representations and promises in purchasing the Agreement and performing under the Agreement, such performance also including payment of significant royalties due to the exclusive license procured under the Agreement; (4) Weems' and W&P's reliance was to Weems and W&P's detriment, including payments of the substantial Agreement Payments and lost profits that W&P would have obtained if it had manufactured its own eVDSD, which it did not do due to the false belief that the eVDSD product it was exclusively licensing was patented; (5) Covelli failed to uphold the representations and promises by failing to provide an exclusive license and by failing to enforce the patents against Orion; and (6) it would be unfair, inequitable, and/or unconscionable for Sirius, or Covelli and Simons (as owners and members of Sirius), to retain the benefits of the Agreement in view of the failure to uphold the representations and promises.

305.     Equitable remedies that the Court may award W&P include, but are not limited to: 1) voiding the Agreement; 2) modifying the Agreement; 3) disgorging from the Sirius Defendants and paying to W&P the Agreement Payments, the increased profits obtained by the

Sirius Defendants due to the breach of the Agreement, the interference with W&P's ability to manufacture and sell the C-1001, and the early termination of the Agreement; 4) disgorging from the Sirius Defendants the profits of any sale or license of the Sirius IP to any third party in violation of Section 6 of the Agreement; and 5) the profits that accrued to Sirius instead of W&P because W&P refrained from manufacturing its own eVDSD due to the false belief that the eVDSD product it was exclusively licensing was patented; and 6) lost profits from the Sirius Defendants failure to renew the Agreement for the life of the patents.

**Count VIII – Unjust Enrichment**

**(Plaintiff against Sirius Defendants)**

306.     W&P repeats and re-alleges each of the foregoing and following allegations as though fully set forth herein.

307.     The Sirius Defendants are liable to W&P for equitable remedies under the doctrine of unjust enrichment, because: (1) Covelli negotiated and executed the Agreement with Weems on behalf of the Sirius Defendants, in which Covelli represented to Weems that Sirius owned valid and enforceable Sirius IP having a scope that covered the C-1001 when Covelli and Simons knew the patents were invalid; (2) Covelli and Sirius purported to grant to Weems/W&P an exclusive license to the Sirius IP, in exchange for the Agreement Payments, and then failed to take diligent steps to enforce the Sirius IP against Orion; (3) the Sirius Defendants attempted to sell the Sirius IP, or a portion thereof, to Orion without offering the opportunity to W&P in violation of W&P's Right of First Offer, which resulted in Sirius' premature termination of the Agreement; and 4) the Sirius Defendants engaged in activities to hinder the ability of W&P to manufacture and sell the C-1001 pursuant to its rights under the Agreement.

308.     The Sirius Defendants were and will continue to be directly unjustly enriched by the receipt of the Agreement Payments, the profits from the sale of products to W&P's customers due to the interference with W&P's ability to manufacture and sell its products and the defamation of W&P; the increased profits to be derived throughout the life of the patents due to the Sirius Defendants' premature termination of the Agreement; and profits that accrued to Sirius instead of W&P because W&P refrained from manufacturing its own eVDSD due to the false belief that the eVDSD product it was exclusively licensing was patented.  Covelli and Simons were and will continue to be, personally enriched via their member distributions based upon Sirius's unjust enrichment; and it would be unfair, inequitable, and/or unconscionable for the Sirius Defendants to benefit from the Agreement at the expense of, and detriment to W&P, which did not receive the bargained-for benefit of the exclusive license under the Agreement for the life of the patents.

309.     Equitable remedies that the Court may award W&P include, but are not limited to: 1) voiding the Agreement; 2) modifying the Agreement; 3) disgorging from the Sirius Defendants and paying to W&P the Agreement Payments and the increased profits obtained by the Sirius Defendants due to the breach of the Agreement, the interference with W&P's ability to manufacture and sell the C-1001, the early termination of the Agreement; 4) disgorging from the Sirius Defendants the profits of any sale or license of the Sirius IP to any third party in violation of Section 6 of the Agreement; and 5) the profits that accrued to Sirius instead of W&P because W&P refrained from manufacturing its own eVDSD due to the false belief that the eVDSD product it was exclusively licensing was patented; and 6) lost profits from the Sirius Defendants failure to renew the Agreement for the life of the patents.