**Count IX – Declaratory Judgment of Unenforceability of the Patents**

**Due to Inequitable Conduct**

**(Plaintiff against Sirius Defendants)**

310.     W&P repeats and re-alleges each of the foregoing and following allegations herein as though fully set forth herein.

311.     Every patent applicant, inventor, and person or entity associated with the filing or prosecution of a U.S. patent application before the USPTO ("Application Participants") has a statutory duty of disclosure and duty of candor and good faith in prosecuting said patent application pursuant to Federal Regulation 37 CFR §1.56.

312.     Application Participants are required to disclose to the USPTO any material, non-cumulative prior art reference that is known to the Application Participant and is relevant to the patentability of a claim of a pending patent application in which the Application Participant is participating.

313.     Failure to disclose a known, material, non-cumulative prior art reference that "compels a conclusion that a claim is unpatentable" (37 CFR §1.56(b)) may be interpreted as a knowing and intentional failure to disclose with the intent to deceive the USPTO where the evidence shows that individual associated with the application suspected that the reference might render a claim unpatentable, but chose to not disclose the reference nonetheless.

314.     As the Court of Appeals for the Federal Circuit stated in *Therasense, Inc. v. Becton, Dickinson and Company*, 649 F.3d 1276 (Fed. Cir. 2011) (*en banc*), "Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent," making the entire patent unenforceable against anyone. "Direct evidence of intent [to

deceive] is not, however, required," the Federal Circuit's decision reads. "A court may infer intent from circumstantial evidence."

315.     Upon information and belief, Simons and Covelli, the co-inventors of the Patents under the Agreement, knew, and therefore Sirius knew, at least as early as December 18, 2015, of the '288 Patent assigned to Tektite, and its materiality to the patentability of the Sirius IP.

316.     Upon information and belief, Simons and Covelli believed, and therefore Sirius believed, at least as early as December 18, 2015, that the '288 Patent was relevant to or covered the model C-1001 Licensed Product, and Covelli informed, and therefore Sirius informed, Weems in writing on December 18, 2015 that the '288 Patent was relevant to, or covered the model C-1001 in agreeing that the C-1001 product should be marked or otherwise marketed in conjunction with the number of the '288 Patent.

317.     As of December 31, 2019, neither Covelli nor Simons disclosed the '288 Patent or any other Material Information to the USPTO during the prosecution of any of the Sirius IP having publicly available prosecution histories, and, upon information and belief, Covelli and Simons, with the intent to deceive, intentionally withheld and failed to disclose the '288 Patent to the USPTO during prosecution of the Sirius IP.   Covelli, Simons, and Sirius had knowledge of items (1) and (3) of the Material Information and, upon information and belief, had knowledge of item (2) of the Material Information.

318.     Upon information and belief, the Sirius Defendants intentionally falsely listed, and submitted false documents claiming Covelli and Simons as the inventors of the Sirius IP, and neither Covelli nor Simons invented the Sirius IP.

319.     Upon information and belief, the Sirius Defendants intentionally and knowingly omitted at least one true inventor of the Sirius IP with the intent of deceiving the USPTO.

320.      The '754 Patent was issued as a CIP of the '436 patent and a substantial amount of new subject matter was added to the application for the '754 Patent, which was filed on April 11, 2016, while Covelli participated as a member of the 132 Committee.  Upon information and belief, Covelli had access to USCG information obtained from discussions held during meetings of the 132 Committee and used this information to supplement the material in the application for the '754 Patent without disclosing same to the USPTO.

321.      Upon information and belief, Sirius and Covelli committed inequitable conduct and/or fraud on the USPTO in and during prosecution of at least one of the patent applications associated with the Patents, by: (1) knowing of multiple material, non-cumulative prior art references; (2) failing to disclose the references to the USPTO during prosecution of said patent application; (3) failing to disclose the true inventors of the Sirius IP to the USPTO; (4) submitting false statements indicating false inventorship to the USPTO, and (5) breaching the duty of disclosure and the duty of candor and good faith during prosecution of said patent application by said failure to disclose involving a material misstatement or omission with intent to deceive.

322.      Upon information and belief, the Sirius Defendants intended to deceive the USPTO in hiding the Material Information because they knew that the Sirius IP would not be found patentable in light of the Material Information since the body of the device was known (it was disclosed in the '288 Patent), the On/Off Switch of the Sirius IP is identical to that disclosed in the '288 Patent, and the other specifications of the Sirius IP were dictated by the USCG.

323.      Upon information and belief, the Sirius Defendants intentionally withheld the Material Information for the purpose of increasing the likelihood of being granted a patent.

324.     Upon information and belief, the Sirius Defendants withheld the true inventorship of the Sirius IP because they did not want an Examiner to find the '288 Patent via an inventor search or a search of patents owned by Tektite.

325.     As a consequence of Sirius's aforementioned inequitable conduct and/or fraud on the USPTO, said patent application and any resulting patent issued therefrom are unenforceable.

326.     W&P requests a declaration that all patents issued from patent applications for which the Sirius Defendants intentionally failed to disclose Material Information and fraudulently misstated inventorship are unenforceable, and that W&P therefore cannot infringe any of such patents because such patents or patent applications are unenforceable.

### Count X – False Patent Marking

### (Plaintiff against Tektite/Sirius Defendants)

327.     W&P repeats and re-alleges each of the foregoing and following allegations as though fully set forth herein.

328.     The false patent marking statute 35 U.S.C. §292(a) criminalizes false marking of products with patent information, including, "[w]hoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word "patent" or any word or number importing that the same is patented, for the purpose of deceiving the public; … Shall be fined not more than $500 for every such offense."  Subsection (b) provides, "A person who has suffered a competitive injury as a result of a violation of this section may file a civil action in a district court of the United States for recovery of damages adequate to compensate for the injury."

329.     At least as early as July 11, 2015, the C-1001 was being falsely advertised as a patented product including, without limitation, on the Web page located at www.siriussignal.com (the "Sirius Web Site"), which, at that time, depicted a picture of the C-1001 and the following

language to the left side thereof "Designed, engineered, patented, and produced in the USA." The Sirius Web Site was under the control of Sirius and its members Covelli and Simons, and as such, they were all responsible for its content.

330.    Upon information and belief, the Tektite/Sirius Defendants were further responsible for this false marking as they caused to be manufactured, or assembled, floats that included "Patent #D720.247S" ("False Marking") thereon ("Falsely Marked Floats").  These Falsely Marked Floats are one of the components of the C-1001 and the False Marking is clearly visible on such floats.  Covelli, Simons, and Sirius caused to be manufactured, assembled and packaged, and Tektite and Mele manufactured, assembled, and packaged the C-1001 incorporating the Falsely Marked Floats. C-1001s were then distributed and sold with the False Marking.

331.    The Tektite/Sirius Defendants undertook the above actions despite the fact that anyone could easily tell from viewing the '247 Patent that the design patented therein clearly did not resemble that of the C-1001, and therefore the '247 Patent clearly did not cover the model C-1001, and despite the fact they knew that all of the patents in the Sirius IP are invalid for at least the following reasons: obviousness, fraud, inequitable conduct, inventor misrepresentation, submission of fraudulent statements to the USPTO, and violation of the duty to disclose material art to the USPTO for reasons set forth elsewhere in this Complaint. This false advertising was done with the intent to deceive the public into believing that the C-1001 was patented in an effort to suppress competition, inflate prices, and further the Tektite/Sirius Defendants' conspiracy of licensing fraudulent patents to Weems/W&P for the purpose of disproportionate economic gain and increased distribution of the C-1001.

332.     The Sirius Defendants further falsely advertised to Weems, specifically Trogdon, that the '436 Patent covered the C-1001.  Upon information and belief, the '436 Patent was also affixed to the float of the C-1001 for a period of time.

333.     The Sirius Defendants also included the '436 Patent in Schedule B of the Agreement before it was executed, thereby advertising to Weems and Trogdon that the '436 Patent covered the C-1001 product.

334.     These false markings and false advertising were done with the intent to deceive the public, including Trogdon and Weems, into believing the C-1001 was patented to suppress competition, inflate prices, and further the Tektite/Sirius Defendants' conspiracy of licensing fraudulent patents to Weems for the purpose of disproportionate economic gain and increased distribution of the C-1001.

335.     Further, Covelli directed Mele verbally around December 30, 2015 to mark the C-1001 with the '436 Patent.

336.     The Tektite/Sirius Defendants caused at least "Patent #D720.247S" to be affixed to the C-1001, from at least as early as July 11, 2015 until approximately April 4, 2016, at which point Weems notified Mele and Tektite via email to remove the "current patent numbers," and Covelli was cc'd on this email.  This action was taken on advice of Belles, who notified Weems, Trogdon, and Covelli in writing via email on March 4, 2016 that the "issued patents do not cover the product" in reference to the '247 Patent, the '436 Patent, and the C-1001 ("Notification of False Marking Email).

337.     Despite receiving the Notification of False Marking Email, the Sirius Defendants continued to falsely advertise the C-1001 product to the public as patented.  Evidence of this includes, without limitation, at least the Sirius Twitter posts of May 18, 2018, May 31, 2016,

June 4, 2016, August 5, 2016, August 12, 2016, September 29, 2016, October 21, 2016, November 25, 2016, December 19, 2016 and February 2, 2017.  These posts all depict the C-1001 in a position in which "Patent #D720.247S" of the Falsely Marked Floats is visible to a reader.  A slight turn of the C-1001 would have obscured the False Marking.

338.     The February 2, 2017 Twitter post, which was posted <u>nearly 11 months after Covelli received the Notification of False Marking</u>, includes an enlarged view of the patent marking and was clearly meant to knowingly and intentionally deceive the public into believing the C-1001 was a patented product, despite at least Covelli's knowledge that the '247 Patent did not cover the C-1001.  Upon information and belief, this picture did not even depict the C-1001 as it was sold at the time of the Twitter post.

339.     Furthermore, as late as July 1, 2019, the Sirius Web Site still depicted the C-1001 with the words "Patent Numbers: 9,171,436 and D720,247" and despite at least Covelli's receipt of the Notification of False Marking Email.

340.     This false marking continues to present day as the Sirius Web Site, as of March 30, 2020, continues to list the C-1001 as being covered by the '754 Patent, the '114 Patent, the '175 Patent, the '920 Patent, and the '477 Patent, and the patents page of the Sirius Web Site specifically states that "this page is intended to serve as notice under 35 U.S.C. § 287(a)."  This advertising also constitutes false marking as the Sirius Defendants know that all of the patents in the Sirius IP are invalid for at least the following reasons: obviousness, fraud, inequitable conduct, inventor misrepresentation, submission of fraudulent statements to the USPTO, and violation of the duty to disclose material art to the USPTO for reasons set forth elsewhere in this Complaint.  This marking is performed with the intent to deceive the public into believing the C-1001 is patented.

341.     In at least the ways mentioned above and otherwise herein in this Complaint, the Sirius Defendants deceived the public in general, and Weems and W&P in particular, that model C-1001 was a patented product covered by the '247 Patent, the '436 Patent, and the other Sirius IP in violation of 35 U.S.C. §292(a).

342.     Weems and W&P suffered numerous competitive injuries due to the false marking of the Sirius Defendants.

343.     Prior to execution of the Agreement, Weems and Sirius were competitors for at least the reason that they both sold marine products directly to consumers.  The false marking actions, and other actions of the Sirius Defendants that were performed to advertise the C-1001 and other Sirius products as patented, caused Weems to enter licensing negotiations with Sirius, and subsequently fraudulently induced Weems to license purported exclusive rights from Sirius, because it believed that the C-1001 product was patented and a license was required to distribute it.

344.     These same false marking actions caused W&P to purchase the Agreement as it believed that the C-1001 product was patented and a license was required to distribute it.  As such, Weems and W&P incurred significant damages in the form of, at least,  excessive Agreement Payments for an exclusive license to license a product that was not in fact covered by valid patents and lost profits due to not manufacturing its own eVDSD due to the false belief that a license was required to manufacture and sell the eVDSD.

345.     W&P further suffered a competitive injury due to the false marking because it lost sales of the C-1001 to at least Customer A because Customer A believed the product was patented, there was a dispute about the right to manufacture the C-1001 product, and Customer A decided to wait to purchase the product from W&P until the issue was resolved.

## COUNT XI - SHERMAN ACT, 15 U.S.C. § 1:

## CONSPIRACY IN RESTRAINT OF TRADE

### (Plaintiff Against All Defendants)

346.    W&P repeats and re-alleges each of the foregoing and following allegations as though fully set forth herein.

## INTERSTATE TRADE AND COMMERCE

347.    Throughout the Injury Period, there was and continues to be a continuous and uninterrupted flow of interstate trade and commerce throughout the United States and worldwide in the sale of eVDSDs by Defendants and their co-conspirators to their customers located throughout the United States and worldwide.

348.    Throughout the Injury Period, Defendants' and their co-conspirators' unlawful conspiracy and agreement took place within, and substantially affected the flow of, interstate commerce and had a direct, substantial, and reasonably foreseeable effect upon commerce throughout the United States and worldwide.

## RELEVANT MARKET

349.    The relevant product market alleged herein is the market for eVDSDs. The relevant geographic market is worldwide.

350.    Pyrotechnic flares are not a part of the relevant market because buyers will not purchase flares in lieu of eVDSDs due to a price increase in eVDSDs. Most eVDSD buyers purchase eVDSDs as an alternative to flares because eVDSDs do not have an expiration date, but flares need to be replaced when they are 42 months old in order to comply with USCG Distress Signal Regulations. Further, many purchasers avoid buying flares because they believe they are toxic for the environment.

351.     As Plaintiff was an exclusive worldwide distributor and is a Maryland entity and the C-1001 is marketed as a Made in America product, the inability to manufacture the products in the United States due to the attempted enforcement of fraudulent patents has an effect worldwide on the price of eVDSDs.

## FACTS

352.     A violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 requires: (1) there was a contract, combination or conspiracy, (2) the agreement unreasonably restrained trade, and (3) the restraint affected interstate commerce.

353.     Defendants engaged in an unlawful conspiracy, as outlined herein, by agreeing to fix, stabilize, inflate, and maintain the price of, eVDSDs licensed and sold to companies and customers in the United States and worldwide, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

354.     Defendants agreed to engage in all activities necessary to provide the Sirius Defendants with a monopoly in the eVDSD market including the elimination of W&P as a competitor and the other Conspiracy Acts, and in furtherance of this goal, the Sirius Defendants would profit from the monopoly and associated sales of the eVDSDs, and the remaining Defendants would profit financially through the provision of goods and services related to manufacturing of the eVDSDs to the Sirius Defendants in accordance with the monopoly.

355.     The conspiracy alleged herein is a per se violation of Section 1 of the Sherman Act. 381. At a minimum, Defendants engaged in vertical price fixing via implementation of an illegal MAP. Alternatively, the conspiracy alleged herein is a rule of reason violation of Section 1 of the Sherman Act. 382. There was no procompetitive business justification for Defendants'

unlawful conspiracy. Even if there were some ostensible procompetitive justification, the

Defendants' conduct was not the least restrictive alternative method to achieve such a purpose.

356.     Defendants illegally conspired to raise the price of eVDSDs by using the Sirius

MAP Policy as defined below.  Sirius maintains a written MAP policy (the "Sirius MAP

Policy").  The purpose of the Sirius MAP Policy as stated therein is to "allow our resellers to

maintain high profit margins."

357.     As also stated in the Sirius MAP Policy, "[a]ll Sirius Signal Authorized Resellers

must agree to the terms and conditions of the following MAP Policy" and "[a]ny and all dealers

selling Sirius Signal products which have not signed a Sirius Signal MAP Policy agreement are

classified as "Unauthorized Resellers" and "Unauthorized Resellers should not be sold to or

provided a feed from any distributor whatsoever."

358.     Upon information and belief, Sirius requires every entity selling a Sirius product

to execute its Sirius MAP Policy, and although the policy indicates that "Resellers are free to set

the actual resale price of any product," it is understood that resellers were not to set the product

to different prices without the approval of Sirius.

359.     If prices were to be set to a lower level, it had to be done with the express,

advance approval of Sirius as stated in the Sirius MAP Policy, i.e., "From time to time, Sirius

Signal may permit resellers to advertise MAP Products at prices lower than the MAP price. In

such events, Sirius Signal reserves the right to modify or suspend the MAP price with respect to

the affected products for a specified period of time by providing advance notice to all resellers of

such changes."

360.     Upon information and belief, the Sirius MAP Policy was also designed to impede

the sales of its goods over the Internet at a price less than the MAP price.

361.     Defendants engaged in a horizontal boycott in agreeing to not sell goods and services to W&P  in order to prevent W&P from competing in the eVDSD marketplace, which resulted in the inability of W&P to manufacture the C-1001, even during a time period in which the Defendants do not dispute that the Agreement was in effect.  The inability of W&P to compete with Sirius due to lack of inventory resulted in increased eVDSD pricing to resellers and, potentially the end consumer, due to lack of competition.

362.     Defendants and their co-conspirators furthered and effectuated their conspiracy, and restrained trade of eVDSDs by, inter alia, performance of the Conspiracy Acts as set forth above.   The facts supporting these allegations are set forth throughout this Complaint including, but not limited to, in the Introduction and Facts sections.

363.     The agreement of the Defendants to commit the Conspiracy unreasonably restrained trade by, at a minimum, artificially inflating prices to meet the MAP pricing levels, and preventing competition via assertion, licensing, and enforcement of fraudulent patents, and this restraint has affected interstate commerce by removing competition (there are only two sellers of eVDSDs and they are in license negotiations with each other) and maintaining the price of eVDSDs at the artificially high level of $89.95.

364.     The restraint of trade of eVDSDs affected interstate commerce by falsely inflating the price of eVDSDs in the relevant market through the elimination and suppression of competition.

365.     The anticompetitive effect of the Conspiracy is to maintain competitors in the eVDSD market to one or two, depending on the timing.  First, in 2015, the only competitor was Sirius as it claimed that its device was patented and it was the only eVDSD approved by the USCG. Thereafter, after execution of the Agreement on December 31, 2015, the sole competitor

was Weems/W&P under license to Sirius until approximately April 2018, at which point Orion entered the relevant market.

366.     Upon Orion's entry into the market, the Defendants conspired to drop the current exclusive licensee, W&P, in favor of offering a license to the sole competitor they could not get rid of otherwise.  In this manner, the Defendants conspired to maintain a monopoly in the eVDSD.

367.     The market share of Sirius prior to Orion entering the market was 100%.  Upon information and belief, after entry of Orion, and without placing Orion under a license agreement, Orion has continually worn away at Sirius' market share such that the share is approximately 50%.

368.     Once the Tektite/Sirius Defendants decided to terminate W&P and compete against W&P, the Defendants acted in concert to limit the supply of the C-1001 by ceasing supply of same and the components thereof to W&P in an attempt to eliminate competition from W&P such that Sirius could maintain prices for the eVDSDs at a fixed price point.

369.     The sole competitor Orion conspicuously lists its Orion Kit at the same price as the Sirius Map Policy price, namely, $89.95 despite the fact that the cost of manufacturing an eVDSD kit is approximately twenty dollars.

370.     The Defendants have attempted to and have conspired to monopolize and, deliberately and by conscious parallelism, have monopolized trade and commerce in the eVDSD industry by Conspiracy Acts enumerated herein in violation of the anti-trust laws, including Sections 1 and 2 of the Sherman Act.

**A.  The eVDSD Market in the United States is Susceptible to Collusion**

371.     Publicly available data on the eVDSD market in the United States demonstrates that it is susceptible to cartelization by the Defendants and their co-conspirators. Factors that make the eVDSD market susceptible to collusion during the Conspiracy Period include: (1) a standardized product for which competition was principally on the basis of price; (2) stable or declining input costs for much of the Conspiracy Period; (3) the lack of available economic substitutes; (4) high barriers to entry; and (5) industry concentration.

**(1) eVDSDs are a standardized product for which competition is principally on the basis of price**

372.     eVDSDs are standardized products for which competition is principally based upon price.

373.     To date, the only available economic substitute available to the Sirius C-1001 Kit is the Orion Kit.  Defendants have attempted to place Orion under Defendants' control via a licensing agreement.

374.     A comparison of the C-1001 Kit and the Orion Kit shows that the products are essentially the same and include a handle, a float, a lens, and a light shining through the lens when such light is activated.

375.     Further, these two eVDSD models must both comply with the USCG Regulations which dictate many aspects of the product including, without limitation, light brightness, light color, signaling manner, independent power source, float ability in fresh water, waterproof switches, and that the electric light may not be equipped with a switch mechanism which permits continuous display of a beam of light except that the light may be equipped with a switch which returns to the off position when pressure is released. As such, due to the similarity of eVDSDs, competition between eVDSD is principally based upon price.

**(2) Stable or Declining Input Costs**

376.     The cost of producing an eVDSD has very slightly declined over the years.  For

example, the cost of manufacturing the C-1001 bodies with lens and assembling the C-1001 in a

clamshell package with a card insert has slightly declined over the years that it has been sold, and

the costs of the other components (e.g., the flag) have remained constant, yet the sales price has

remained constant at $89.95 - $99.99 per unit.  For example, in 2016, the cost of manufacturing

the C-1001 excluding the cost of the float, flag, circuit board and packaging was $10.03, which

dipped to $9.13 in 2017, and then settled out at $9.67 in 2019.  The total cost to manufacturer the

C-1001 as a whole has remained relatively stable at approximately $19.53 throughout the

Conspiracy Period.

**(3) Lack of Available Economic Substitutes**

377.     Economists regard products as economic substitutes for one another if a nominal

change in price for one product results in increased demand for the other product. The change in

price necessary to cause consumers to switch to a substitute good is often considered to be

around five percent.

378.     There is no economic substitute for eVDSDs, and the lack of available economic

substitutes for a product facilitates collusion among producers, because customers are not

reasonably able to avoid supra-competitive prices by switching to another product.

**(4) There Are Significant Barriers to Entry in the eVDSD Market**

379.     Supra-competitive pricing in a market typically attracts additional competitors

attempting to avail themselves of the inflated prices. Significant barriers to entry, however, make

new competition more difficult and facilitate the formation and maintenance of a cartel.

380.     There are significant barriers to entry which have prevented potential competitors from effectively competing in the eVDSD market in the United States during the Injury Period. A first barrier to entry is the assertion of fraudulently procured patents by Defendants against potential competitors and the deterring of potential competitors due to the knowing false marking of its C Series Products with "patent pending," or patent numbers that are either expired, did not cover the product, or are unenforceable due to inequitable conduct before the USPTO.

381.      Further barriers include satisfaction of regulatory requirements, i.e., obtaining USCG approval under regulations that, upon information in belief, constantly changed in part due to the influence of Covelli's presence on the USCG committee.  Access to distribution channels was also limited as Defendants sought to lock up all marine distribution channels through the Agreement and its MAP policies.  The eVDSD market had one new entrant during the Conspiracy Period, namely, Orion.

382.     Defendants are further suppressing competition by attempting to influence the USCG Distress Signal Regulations such that they would exclude single color eVDSDs, which would leave the improved C-1002 Sirius eVDSD as the only USCG-approved eVDSD, thereby resulting in a monopoly.

**(5) The eVDSD Industry Is Highly Concentrated**

383.     The eVDSD industry is dominated by a small number of companies.  Prior to its attempted termination of the Agreement, eVDSDs were sold by two companies, namely, W&P and Orion.  After attempting to wrongfully terminate the Agreement and license the Sirius IP to Orion, if successful, only Orion would remain.  If unsuccessful, two competitors will remain, Sirius and Orion.

88

384.     The concentration in the eVDSD industry is further exacerbated by agreements among Defendants and their co-conspirators to distribute one another's products.  For example, Tektite distributes at least the C-1001 on its website, and Sirius distributes Tektite's products on the Sirius Web Site.  Such swaps, trades, and selling and distribution agreements among competitors in a consolidated market facilitate collusion among ostensible competitors.

**B.  Opportunities To Collude Facilitated The Conspiracy**

385.     There were countless opportunities for Defendants to communicate and conspire with each other. Upon information and belief, Defendants regularly met and/or discussed each other's business.  Defendants hid the nature of their relationship, and their conspiracy, from others.

386.     Defendants secretly targeted a business relationship with their only competitor Orion at some point prior to termination of the Agreement in breach of the Right of First Offer to their exclusive worldwide distributor W&P.

387.     Upon information and belief, throughout the Conspiracy Period, at least the Tektite/Sirius Defendants were in regular communication to facilitate the conspiracy.

388.     Defendants and their co-conspirators enjoyed supra-competitive profit margins on the sale of eVDSDs, or the cost of producing the eVDSDs or components thereof, and inflated royalties during the Conspiracy Period due to the false belief that Defendants owned valid patents that protected the eVDSDs. Thus, potential sellers of eVDSDs could have entered the market and sold eVDSDs at considerably lower prices and still make a profit, however, these potential sellers were deterred by the anti-competitive conduct of the Defendants. Among the reasons for Defendants and their co-conspirators to hide their conspiracy and the invalidity of the Sirius Patents was to protect their supra-competitive profit margins.

**C.  Policing and Enforcement Efforts**

389.        Upon information and belief, Defendants also undertook specific efforts to monitor and enforce the conspiracy.

**D.  Defendants and Their Co-Conspirators Maintained, and Continue to Cause Injury Through and Benefit from, Their Unlawful Conspiracy**

390.        Defendants, each having joined and participated in the unlawful conspiracy described herein, and each having performed overt acts in furtherance of this unlawful conspiracy, needed to affirmatively withdraw from the unlawful conspiracy in order to terminate their participation therein.

391.        None of the Defendants and their co-conspirators did so. To the contrary, upon information and belief, the Defendants continue to communicate with each other about the subject matter of the conspiracy, continue to conceal the conspiracy from customers and the general public, and continue to substantially maintain (and, in some cases, even increase) the supra-competitive prices they charged for eVDSDs.

392.        Concealing the conspiracy from their licensees, customers and the general public enabled Defendants and their co-conspirators to maintain, and continue to cause injury through and benefit from, their unlawful conspiracy concerning eVDSD as evidenced, inter alia, by their ability to substantially maintain, or even increase, the supra-competitive prices they charged their customers for eVDSD.

393.        Defendants' eVDSD pricing behavior cannot be justified by higher component or manufacturing costs, as the prices for the components used to manufacture eVDSDs and the cost of manufacturing the eVDSDs has slightly decreased during the Conspiracy Period.

394.     As a result of the conspiracy among Defendants and their co-conspirators, Plaintiff has been forced to pay supra-competitive royalties for eVDSD under the false belief that they were protected by patents.

395.     As a result of Defendants' unlawful conspiracy, Plaintiff sustained damages to their business or property. The full amount of such damages will be determined after discovery and upon proof at trial and, include, at a minimum future lost profits from failure of the Sirius Defendants to offer W&P the Right of First Offer for the license of the C-1002.

396.     The conspiracy had its intended effect, and the Sirius Defendants benefitted by reaping inflated royalties, revenues, and profits from their supra-competitive eVDSD pricing in the form of Amazon sales and sales to resellers, and Emlinq and the Tektite Defendants benefitted from inflated profits from sales of the components of, or manufacturing of, the eVDSD to the Sirius Defendants.

397.     Defendants' unlawful conduct as alleged herein poses a significant, continuing threat of antitrust injury for which injunctive relief is appropriate under Section 16 of the Clayton Antitrust Act.

398.     Plaintiff reserve the right to add additional Defendants as information is developed as to other parties.

**E.  Fraudulent Concealment**

399.     Defendants and their co-conspirators engaged in a successful unlawful conspiracy which, by its very nature, was self-concealing.

400.     Upon information and belief, Defendants and their co-conspirators used non-public means of communication, such as electronic email communications and verbal communications to conceal their agreements to eliminate competition by committing the

Conspiracy through performance of the Conspiracy Acts.  Upon information and belief,

Defendants and their co-conspirators wrongfully concealed and carried out their illegal conduct

in a manner that was designed to, and did, preclude detection.

401.     Plaintiff did not have actual or constructive knowledge of Defendants' and their

co-conspirators' unlawful scheme until on or about November 1, 2019, when its counsel

investigated the facts of the claims in preparing a first amended complaint in the pending

litigation having case no. 1:19-cv-02330-RDB. Because Defendants' and their co-conspirators'

anticompetitive conduct was both self-concealing and affirmatively concealed by Defendants and

their co-conspirators', neither Plaintiff nor any other eVDSD purchasers learned, or could have

learned or discovered, the operative facts giving rise to this Complaint until sometime after

November 1, 2019. No information, actual or constructive, was ever made available to Plaintiff

or any other eVDSD purchasers that would have led a reasonably diligent person to investigate

whether an unlawful conspiracy with regard to eVDSD existed prior to November 1, 2019.

402.     W&P's discovery of the '288 Patent alone and the Sirius Defendants' failure to

disclose the '288 Patent to the USPTO during prosecution of the Sirius Patents was not sufficient

to put Plaintiff or any other reasonable United States purchaser of eVDSD on notice that an

extensive conspiracy to suppress competition and fix the price of eVDSDs may have existed. Not

only did Defendants and their co-conspirators conduct their conspiracy in secret, they also

affirmatively misled their customers, including Plaintiff, as to the existence of their unlawful

conspiracy.

403.     In selling the eVDSDs, Defendants and their co-conspirators often falsely asserted

that their eVDSDs were patent protected and that in the near future, would be the only eVDSDs

licensed by the USCG thereby providing an excuse concealing the true cause of the inflated price of the eVDSDs – the unlawful conspiracy – from eVDSD purchasers.

404.     The affirmative misrepresentations Defendants and their co-conspirators made to Plaintiff and other eVDSD purchasers, were meant to, and did, prevent Plaintiff from discovering the actual reason for the artificially-inflated prices and royalties. Because of the self-concealing nature of Defendants' and their co-conspirators' unlawful conspiracy and the affirmative acts of concealment described above, Plaintiff were unaware of Defendants' and their co-conspirators' unlawful conspiracy and were unaware that they were paying artificially inflated royalties for eVDSDs during the Injury Period. The self-concealing nature of Defendants' and their co-conspirators' conspiracy, coupled with the affirmative acts of concealment described herein, prevented Plaintiff from discovering through reasonable diligence that Defendants and their co-conspirators had engaged in the unlawful conspiracy described herein. Accordingly, Defendants' their co-conspirators' fraudulent concealment tolled all statutes of limitations applicable to Plaintiff's claims. No applicable statute of limitations began to run on Plaintiff's claims until, at the earliest, November 1, 2019, the day upon which Plaintiff's counsel uncovered facts suggesting the need to further investigate the claims set forth herein.

## COUNT XII -SHERMAN ACT, 15 U.S.C. § 1, 2: CLAYTON ACT, 15 U.S.C. § 3 TYING

### (PLAINTIFF AGAINST SIRUS DEFENDANTS)

405.     Plaintiff incorporate by reference the preceding and following paragraphs as though set forth fully herein.

406.     Impermissible tying arrangements arise when a party agrees to sell one product (the tying product, i.e., the C-1001/C-1003) but only on the condition that the buyer also

purchases a different (or tied) product, i.e., the C-1002. To establish a per se tying claim

under §§ 1 and 2 of the federal Sherman Antitrust Act,  a Plaintiff must prove (1) the existence of

two separate products, i.e., in this case, the C-1001/C-1003 (one color light) and the C-1002 (two

color light); (2) an agreement conditioning purchase of the tying product upon purchase of the

tied product (or at least upon an agreement not to purchase the tied product from another party);

(3) the seller's possession of sufficient economic power in the tying product market to restrain

competition in the tied product market; and (4) a not insubstantial impact on interstate

commerce.

407.    The conspiracy alleged herein is a per se violation of Sections 1 and 2 of the

Sherman Act.

408.    During negotiation of a fourth amendment to the Agreement (the "Fourth

Amendment"), the Sirius Defendants conditioned the signing of the Fourth Amendment and the

licensing of the C-1001/C-1003 upon the execution of a new license for the C-1002 including

payment of a substantial upfront fee of two hundred and seventy thousand dollars ($275,000).

409.    The Sirius Defendants possessed sufficient economic power in the tying product

market to restrain competition in the tied product market.  Upon information and belief, at the

time of the attempted tying agreement, the Sirius Defendants had at least fifty percent market

share of the eVDSD market.  Further, the Sirius Defendants claimed that its eVDSD and the

Orion eVDSD were covered by the Sirius IP, and as such, implied to other potential suppliers of

eVDSDs and W&P that it would likely achieve a monopoly in the eVDSD market through

enforcement, or licensing, of the Sirius IP against Orion.

410.    As described herein, the Sirius Defendants demonstrated market power by

reducing output of eVDSD products by controlling the information required to manufacture the

94

eVDSD and by conspiring with manufacturers to deny and delay orders and to artificially increase the costs of manufacturing eVDSDs for W&P.

411.      The requisite market power for a tying agreement may be inferred when the tying product (i.e., the C-1001 or C-1003) is patented, which Sirius claims it is, because a buyer is unable to buy the product elsewhere.  If Orion takes a license under the Sirius IP, there would be no alternative, USCG-approved eVDSD product available for a purchaser to buy elsewhere.

412.      The Sirius Defendants wished to use its market power in the eVDSD market to force W&P to do something it would not otherwise do, i.e., pay $275,000 for an upfront licensing fee for the C-1002 (in addition to ongoing royalties) despite the fact that W&P had already licensed the C-1002 under the Agreement.  The Sirius Defendants coerced W&P to license the C-1002 in order to license the product it definitely wanted, namely the C-1001/C-1003.

413.      The C-1001/C-1003 and C-1002 have separate demand functions such that customers would never buy them together. A customer buying either the C-1001/C-1003 or the C-1002 will have no need for the other product because the products perform the same function, (i.e., night distress signal), and only one of such lights is required to be carried aboard a boat in order to comply with USCG regulations.  However, the C-1002 is at a price point triple of the C-1001/C-1003 and arguably has better recognition than the C-1001/C-1003 for first aid responders or the like.

414.      The impact on interstate commerce of the proposed tying agreement would not have been insubstantial.  No other two color eVDSD exists in the market so a successful tying arrangement would have affected 100% of the two color eVDSD market.  Additionally, the only other eVDSDs available for sale at the time of the proposed tying agreement and today are the

single color Sirius C-1001/C-1003 eVDSD and the single color Orion eVDSD.  At the time of

the proposed tying agreement, upon information and belief, Sirius intended to license its Sirius

IP to Orion to cover the Orion eVDSD, thereby monopolizing the eVDSD market.  The tying of

the C-1002 to the C-1001/C-1003 would have allowed Sirius to retain a monopoly on the entire

eVDSD marketplace by allowing only W&P and Orion to distribute eVDSDs rather than

allowing a third company to independently license the C-1002.

415.    Also, the tying of the eVDSD to the C-1001/C-1003 will have the impact of

raising the price of these products as the licensee would need to raise prices in order to be

compensated for the $275,000 upfront licensing fee for the C-1002.

416.    Alternatively, the conspiracy alleged herein is a rule of reason violation of Section

1 of the Sherman Act. 382. There was no procompetitive business justification for Defendants'

unlawful conspiracy. Even if there were some ostensible procompetitive justification, the

Defendants' conduct was not the least restrictive alternative method to achieve such a purpose.

## COUNT XIII -SHERMAN ACT, 15 U.S.C. § 2:

## MONOPOLIZATION

## (Plaintiff Against All Defendants)

417.    W&P repeats and re-alleges each of the foregoing and following allegations as

though fully set forth herein.

418.    The facts as set forth herein in the Complaint indicate that the Defendants had:

(1) a specific intent to monopolize the eVDSD market; (2) predatory or anticompetitive acts in

furtherance of the intent including, but not limited to the Conspiracy Acts; and (3) a dangerous

probability of success in that the Defendants, *inter alia*, have blocked the exclusive distributor

W&P from manufacturing and selling the product to decrease supply of eVDSDs, the Defendants

are attempting to license the Sirius IP to the sole eVDSD competitor, Orion, and simultaneously the Defendants are conspiring to change the USCG Distress Signal Regulations such that only its new two color light (the C-1002) will be USCG-approved, in which case the Defendants will again achieve a full monopoly and will achieve the supra-competitive price of $299.99 for all USCG-approved eVDSDs.

419.    The predatory and anticompetitive acts are, at a minimum, the Conspiracy Acts and other acts set forth above and included elsewhere in this Complaint.

420.    Defendants have a dangerous probability of success as they have shut out the exclusive licensee of the eVDSDs, W&P, via a false breach of contract claim and a horizontal boycott of W&P's supply of the C-1001 eVDSD, and components thereof, in order to license the only other competitor in the eVDSD market, Orion, and are currently in negotiations with Orion. If these negotiations are successful, there will be a true monopoly in the eVDSD market, i.e., Sirius will control 100% of the eVDSD market through its sole licensee, Orion.  Even if these negotiations are not successful, Sirius has still gained at least a 50% share in the eVDSD market via wrongfully terminating its exclusive licensee, W&P.

421.    The Sirius Defendants have willfully acquired and maintained monopoly power in the relevant market through the Conspiracy Acts including, without limitation the ongoing procurement, licensing, and assertion of fraudulent U.S. Patents, the control of information and manufacturers necessary to manufacture eVDSDs, and manipulation of the USCG regulations vis a vis Covelli's position as a member of the 132 Committee.

422.    The Sirius Defendants have the power to control eVDSD prices and do control prices through the implementation of the Sirius MAP Policy.  Sirius is attempting to exclude

competition and obtain a monopoly by forcing the sole competitor, Orion, to license its fraudulent patents and comply with the Sirius MAP Policy.

423.　　Upon information and belief, Sirius has a market share of 50% or higher and, if successful in licensing negotiations with Orion, it will own 100% of the market share.

## COUNT XIV - MARYLAND ANTITRUST ACT § 11-204(a)(1)

### RESTRAINT OF TRADE

### (Plaintiff against All Defendants)

424.　　W&P repeats and re-alleges each of the foregoing and following allegations as though fully set forth herein.

425.　　The Defendants by agreement and conspiracy with each other unreasonably restrained trade or commerce via perpetrating the Conspiracy Acts and other acts set forth herein.

426.　　Defendants engaged in an unlawful conspiracy by agreeing to fix, stabilize, inflate, and maintain the price of eVDSDs sold to companies, municipalities, and governmental subdivisions in, among other places, the State of Maryland, in violation of the Maryland Antitrust Act.

427.　　Plaintiff is a Maryland limited liability company and has standing to maintain an action to recover damages sustained as a result of a violation of the Maryland Antitrust Act regardless of whether Plaintiff purchased directly or indirectly with a person who committed the violation.

428.　　The conspiracy alleged herein is a per se violation of the Maryland Antitrust Act. 392. Alternatively, the conspiracy alleged herein is a rule of reason violation of Maryland Antitrust Act.

429.     There was no procompetitive business justification for Defendants' unlawful

conspiracy. Even if there were some ostensible procompetitive justification, the Defendants'

conduct was not the least restrictive alternative method to achieve such a purpose.

430.     Defendants and their co-conspirators furthered and effectuated their conspiracy,

inter alia, by committing the Conspiracy Acts and other acts alleged herein.

431.     As the result of Defendants' unlawful conspiracy, Plaintiff sustained damage to its

business or property. The full amount of such damages will be determined after discovery and

upon proof at trial.

432.     The conspiracy had its intended effect, and Defendants benefitted by reaping

inflated revenues from their supra-competitive eVDSD pricing.

433.     Defendants' unlawful conduct as alleged herein poses a significant, continuing

threat of antitrust injury for which injunctive relief is appropriate under the Maryland Antitrust

Act.

434.     Plaintiff reserves the right to add additional Defendants as information is

developed as to other parties.

### COUNT XV - MARYLAND ANTITRUST ACT § 11-204(a)(2)

### ATTEMPT AND CONSPIRACY TO MONOPOLIZE

### (Plaintiff against All Defendants)

435.     W&P repeats and re-alleges each of the foregoing and following allegations as

though fully set forth herein.

436.     The Defendants monopolized, attempted to monopolize, and combined and

conspired with each other to monopolize the eVDSD trade or commerce worldwide for the

purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce.

437.    Defendants engaged in an unlawful conspiracy by agreeing to fix, stabilize, inflate, and maintain the price of eVDSDs sold to companies, municipalities, and governmental subdivisions in, among other places, the State of Maryland, in violation of the Maryland Antitrust Act.

438.    Plaintiff is a Maryland limited liability company and has standing to maintain an action to recover damages sustained as a result of a violation of the Maryland Antitrust Act regardless of whether Plaintiff purchased directly or indirectly with a person who committed the violation.

439.    The conspiracy alleged herein is a per se violation of the Maryland Antitrust Act. Alternatively, the conspiracy alleged herein is a rule of reason violation of Maryland Antitrust Act.

440.    There was no procompetitive business justification for Defendants' unlawful conspiracy. Even if there were some ostensible procompetitive justification, the Defendants' conduct was not the least restrictive alternative method to achieve such a purpose.

441.    Defendants and their co-conspirators furthered and effectuated their conspiracy, inter alia, by committing the Conspiracy Acts and other acts alleged herein.

442.    As the result of Defendants' unlawful conspiracy, Plaintiff sustained damage to its business or property. The full amount of such damages will be determined after discovery and upon proof at trial.

443.    The conspiracy had its intended effect, and Defendants benefitted by reaping inflated revenues from their supra-competitive eVDSD pricing.

444.     Defendants' unlawful conduct as alleged herein poses a significant, continuing threat of antitrust injury for which injunctive relief is appropriate under the Maryland Antitrust Act.

445.     Plaintiff reserves the right to add additional Defendants as information is developed as to other parties.

## Count XVI – Business Defamation

## (Plaintiff Against Sirius Defendants)

446.     W&P repeats and re-alleges each of the foregoing and following allegations as though fully set forth herein.

447.     Upon information and belief, Covelli and Sirius committed defamation by: (1) making  defamatory statements regarding W&P to the Finnish Safety and Chemicals Agency; (2) the statements were false; (3) Sirius was legally at fault in making the statement and (4) W&P suffered harm thereby.

448.     On or about August through October 2019, Covelli had an email exchange with Jenni Mutka of the Finnish Safety and Chemicals Agency in which he made false statements to the detriment of W&P.

449.     On or about August 9, 2019, Covelli told the Finnish Safety and Chemicals Agency that their licensee W&P sent the product at issue with a red lens to a supplier in Finland. The email continued "The items were supplied and sent by Weems & Plath (Annapolis MA) and, incorrectly identified by the same model number as the US government required version.  This incorrect labeling on the unit can lead to confusion as to which light is legal for the US should the lights sold in Finland make there [sic] way outside of Finland.  They could cause more serious issues should the lights be deployed by boaters and ships crew as the color and flash

characteristics (SOS) of a red light mean nothing in other countries, particularly in the US.  Our company as holders of the IP have great liability because these two lights carry the same C-1001 model #.  See attached photo's  Additional these light were received with no packaging as per Finnish requirements."

450.      Sirius knew or should have known that the following statement identified in at least paragraph 492 is false: "Our company as holders of the IP have great liability because there two lights carry the same C-1001 model #."  Sirius knew that the license agreement provided them indemnification, and they were not subject to great liability, and Sirius had previously approved shipment of the red lights to Finland in the same form in which they were sent.

451.      Sirius intended to deceive the Finnish Safety and Chemicals Agency by this statement so that the agency would pull the product from the market in Finland and would contact W&P's client Multimarine, thereby damaging W&P's relationship with Multimarine and its ability to sell product to Multimarine at a future date.

452.      On or about September 8, 2019, Covelli emailed Jenni Mutka at the Finnish Safety and Chemicals Agency and stated in part: "The company in Finland is Multimarine … This incorrectly marked and labeled life-saving device (selling in Finland right now) must be corrected … Same Unit labeled C-1001 with RED FLASHING SOS and identical US bar code (as the [sic] WHITE version), sold in Finland.  This is a not acceptable, as only the WHITE SOS VERSION MODEL C-1001 is authorized for carriage … It is imperative this be enforced by the Finnish authorities as the confusion can lead to boaters believing that the light Model C-1001 in RED can lead to recognition and rescue.  Model C-1001 markings can only be on the WHITE SOS.  This type of confusion can lead to a grave situation with a unfortunate outcome.  Each incorrectly labeled unit sold increases the chance of tragedy.  Risk in this case, can be mitigated

with swift enforcement.  Please confirm you are taking action for the safety of boaters in the United Sates [sic] as well as the EU.  I will forward a copy of your corrective action to the proper US Governmental agencies."

453.     Sirius knew or should have known that at least the following statement identified in paragraph 495 above is false: "and identical US bar code (as the [sic] WHITE version)" as Sirius was notified in writing on August 1, 2019 that the Finnish Light carried a "different UPC code from the lights sold in the U.S."

454.     Sirius intended to deceive the Finnish Safety and Chemicals Agency by this statement so that the agency would pull the product from the market in Finland and would contact W&P's client Multimarine, thereby damaging W&P's relationship with Multimarine and its ability to sell product to Multimarine at a future date.

455.     As a result of the statements identified in paragraph 495 above, the Finnish Safety and Chemicals Agency contacted the Finnish importer of the product and requested additional information and pictures regarding the product.

456.     The statements identified in paragraph 495 above caused harm to W&P's business reputation, as they placed W&P's customer, Multimarine, in the position of having a conflict with a governmental agency, specifically, the Finnish Safety and Chemicals Agency and are thus defamation per se.

457.     Additionally, the statements identified in paragraph 495 above directly caused W&P damage in loss of future sales to the Finnish importer.

## COUNT XVII -LANHAM ACT

## FALSE ADVERTISING

### (Plaintiff Against Tektite/Sirius Defendants)

458.     W&P repeats and re-alleges each of the foregoing and following allegations as though fully set forth herein.

459.     To establish a Lanham Act false advertising claim, a Plaintiff must prove that:  (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

460.     On August 25, 2019, during the time that the Agreement was still in effect, the Tektite/Sirius Defendants made the false or misleading description of fact or representation of fact in a commercial advertisement, namely, *inter alia*, in at least a press release on the Sirius Web Site, that (1) "as a part of this roll out, Sirius Signal will no longer license its technology, and will be the sole manager of all distribution and retailer partnerships" and (2) "[w]ith the expiration of Sirius Signal's patent license agreement with Weems & Plath, Sirius Signal will be the sole manufacturer of its patented SOS Distress Light."

461.     Statement (1) is false because the Agreement had not expired and as such Sirius was still licensing its technology, and, even if Sirius argues that it had expired, W&P still had the right to sell the C-1001 inventory on hand during the Sell-Off Period.

462.     Statement (2) is false because the Agreement never expired, rather it was terminated without cause.  Nor would the Agreement have expired on December 31, 2020 because it included an automatic renewal provision.

463.     These statements are material and influenced the purchasing decisions of at least Customer A, who decided to stop purchasing the C-1001 until the issue was resolved.

464.     These representations actually deceived a substantial segment of its audience to believe that W&P did not have the right to sell the C-1001 and, that the C-1001 was being replaced by the C-1003.

465.     The Tektite/Sirius Defendants placed the false and misleading statement into interstate commerce by placing the statement on, at a minimum, the Sirius Web Site, and otherwise issuing it as a press release.

466.     W&P has been injured as a result of the misrepresentation, by direct loss of sales (with respect to Customer A who stopped purchasing the C-1001), potential diversion of sales, and by a lessening of goodwill associated with its products.

PRAYER FOR RELIEF AGAINST DEFENDANTS

WHEREFORE, W&P prays for the following:

**<u>Primary Set of Prayers for Relief:</u>**

A.  An order declaring that the Defendants' conspiracy and the acts performed in furtherance thereof be adjudged to have violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 and the Maryland antitrust laws;

B.  With respect to the state law claims asserted herein, that the Defendants' conduct be adjudged to have violated Maryland state laws;

C.  An order declaring that the Defendants be preliminarily and permanently enjoined and restrained from continuing and maintaining the conspiracy described herein;

D.  An order declaring each patent Assignment to "Sirius Signal Co." null and void;

E.  An order declaring the Agreement null and void for fraud;

105

F. An order requiring Defendants to pay to W&P the substantial upfront fee and all royalties paid by W&P to date, including those held in the court's registry;

G. An order declaring that the patents are unenforceable due to the inequitable conduct of Covelli, Simons, and Sirius;

H. An order declaring that the patents are unenforceable due to the fraud committed on the USPTO by Covelli and Simons for failure to disclose Material Information to the USPTO during prosecution of the Sirius IP and the misrepresentation of the inventorship of the Sirius IP, and the submission of false documents to the USPTO;

I. An order declaring that W&P suffered a competitive injury due to the Tektite/Sirius Defendants' false patent marking, and compensating W&P accordingly;

J. An order requiring Sirius, Covelli, and Simons to indemnify W&P for any liability for infringement of any future patents issued to Sirius, Covelli, or Simons;

K. An order requiring Covelli, Simons, and Sirius to pay compensation for its unjust enrichment;

L. An order requiring Covelli to cease its unfair competition, civil conspiracy, and tortious interference with the business relations/expectancy and contractual relations of W&P and to pay compensation to W&P for its lost sales and other damages caused by same;

M. An order requiring Covelli to pay compensation for the damage to the reputation of W&P due to the Tektite/Sirius Defendants' defaming of W&P;

N. An award to W&P of compensatory and punitive damages in an amount to be determined at trial;

O.  An award of enhanced damages to Plaintiff of treble the amount of compensatory damages caused by Defendants' violation of federal and state antitrust laws, and in accordance with such laws pursuant to Section 3 of the Clayton Act;

P.  An award to W&P of interests, costs, and attorneys' fees;

Q.  That Defendants pay pre-judgment and post-judgment interest on the damages awarded; and

R.  Such further relief as this Court may deem just and equitable.

**<u>Secondary Set of Prayers for Relief:</u>**

In the event that the Court decides not to follow the Primary Set of Prayers for Relief by virtue of deciding that the Agreement will not be held null and void, W&P prays that the Court follow this Secondary Set of Prayers for Relief that includes the following:

A.  An order declaring that the Defendants' conspiracy and the acts performed in furtherance thereof be adjudged to have violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 and the Maryland antitrust laws;

B.  With respect to the state law claims asserted herein, that the Defendants' conduct be adjudged to have violated Maryland state laws;

C.  An order declaring that the Defendants be preliminarily and permanently enjoined and restrained from continuing and maintaining the conspiracy described herein;

D.  An order declaring each patent Assignment to "Sirius Signal Co." null and void;

E.  An order declaring that the Sirius, Covelli, and Simons breached the Agreement;

F.  An order requiring Defendants to refund a portion of the initial license fee in accordance with the repayment schedule of the Agreement;

G.  An order declaring that the patents are unenforceable due to the inequitable conduct of Covelli, Simons, and Sirius;

H.  An order declaring that the patents are unenforceable due to the fraud committed on the USPTO by Covelli and Simons for failure to disclose Material Information to the USPTO during prosecution of the Sirius IP and the misrepresentation of the inventorship of the Sirius IP, and the submission of false documents to the USPTO;

I.  An order declaring that W&P suffered a competitive injury due to the Tektite/Sirius Defendants' false patent marking, and compensating W&P accordingly;

J.  An order requiring Sirius, Covelli, and Simons to indemnify W&P for any liability for infringement of any future patents issued to Sirius, Covelli, or Simons;

K.  An order requiring Covelli, Simons, and Sirius to pay compensation for its unjust enrichment;

L.  An order requiring Covelli to cease its unfair competition, civil conspiracy, and tortious interference with the business relations/expectancy and contractual relations of W&P and to pay compensation to W&P for its lost sales and other damages caused by same;

M.  An order requiring Covelli to pay compensation for the damage to the reputation of W&P due to the Tektite/Sirius Defendants' defaming of W&P;

N.  An award to W&P of compensatory and punitive damages in an amount to be determined at trial;

O.  An award of enhanced damages to Plaintiff of treble the amount of compensatory damages caused by Defendants' violation of federal and state antitrust laws, and in accordance with such laws;

P.   An award to W&P of interests, costs, and attorneys' fees;

Q.   That Defendants pay pre-judgment and post-judgment interest on the damages

awarded; and

R.   Such further relief as this Court may deem just and equitable.

### **REQUEST FOR JURY TRIAL**

W&P hereby requests a jury trial on all issues so triable.


Respectfully submitted,

Dated:   April 17, 2020          /s/ Timothy F. Maloney
Timothy F. Maloney (Bar ID#03381)
Alyse L. Prawde (Bar ID #14676)
JOSEPH, GREENWALD & LAAKE, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
(301) 220-2200 (tel.)
tmaloney@jgllaw.com
aprawde@jgllaw.com

Rita C. Chipperson, Esq.*
Kevin M. Curran, Esq.*
CHIPPERSON LAW GROUP, P.C.
163 Madison Avenue
Suite 220-40
Morristown, NJ 07960
(973) 845-9071 (tel.)
rcc@chippersonlaw.com
kmc@chippersonlaw.com

*Counsel for Plaintiff*
*Weems & Plath, LLC*

*\*Pro hac vice admission anticipated.*